JACKSON E. CAGLE, JR., AND ANN CAGLE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

CHARLES L. WEBSTER, JR., AND SYLVIA WEBSTER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6967-71, 6968-71.    Filed November 4, 1974.

*Robert C. Taylor* and *Fred Lohmeyer,* for the petitioners.
*Douglas R. Fortney,* for the respondent.

STERRETT, *Judge:* The respondent determined deficiencies in the Federal income taxes of petitioners Jackson E. Cagle, Jr., and

Ann Cagle and petitioners Charles L. Webster, Jr., and Sylvia Webster for their taxable years 1968 in the amounts of $33,218.44 and $14,006.80, respectively. Certain issues not having been raised in the petitions to the Court, the sole issue for determination is whether a $90,000 management fee paid by the partnership Parkway Property Co. to John F. Eulich d.b.a. the Vantage Co. is a deductible expense of the partnership.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Petitioners Jackson E. Cagle, Jr., and Ann Cagle are husband and wife who, at the time of the filing of the petition herein, maintained their legal residence in Fort Worth, Tex. They filed their joint Federal income tax return for the calendar year 1968 with the district director of internal revenue at Dallas, Tex. Petitioners Charles L. Webster, Jr., and Sylvia Webster are husband and wife who, at the time of the filing of the petition herein, maintained their legal residence in Fort Worth, Tex. They filed their joint Federal income tax return for the calendar year 1968 with the district director of internal revenue at Dallas, Tex. Ann Cagle and Sylvia Webster are parties to this action solely by virtue of having filed joint returns and consequently Jackson E. Cagle, Jr., and Charles L. Webster, Jr., will hereinafter be referred to as the petitioners.

Pursuant to a partnership agreement dated August 1, 1968, John F. Eulich (hereinafter Eulich) as the managing partner and petitioners as the investor partners entered into a partnership known as Parkway Property Co. (hereinafter referred to as the partnership or Parkway). According to the partnership agreement the purpose of the partnership was "to construct, acquire by purchase, own, hold, deal in, mortgage, operate, manage, equip, lease, sell, exchange, transfer or in any manner dispose of warehouses, office buildings, and other commercial property, and to do and perform all things necessary or incidental or connected with or growing out of such business."

The partnership agreement further states that the partnership expected to develop an office-showroom of approximately 80,000 square feet on 5.255 acres of land known as Parkway Plaza, which Eulich was to, and did, contribute to the partnership subject to

an outstanding loan commitment obtained by Eulich. The office-showroom facility, as eventually developed, contained approximately 80,000 square feet and consisted of three buildings.

The partnership agreement specifies that all interest and ad valorem taxes to be paid during the period August 31, 1968, to December 31, 1969, on the contributed real estate and all commissions, management compensations, and other expenses would be allocated 100 percent to the investor partners pro rata, not to exceed an aggregate of $150,000. It further provides that the managing partner may make in his own name expenditures for interest, taxes, fees, commissions, and other expenses on behalf of the partnership and shall be entitled to reimbursement for such expense, not to exceed $150,000 during the period August 1, 1968, to December 31, 1969.

The investor partners were to, and did, contribute $200,000 in cash during the period August 1, 1968, to December 31, 1969, and they agreed that most of such sum would be used by the partnership either to pay the above expenses or to reimburse Eulich directly. The net profits of the partnership, the net gains resulting from the sale or other disposition of any property held by the partnership, and the losses of the partnership were to be divided in the following proportions:

| | |
|---|---|
| John F. Eulich | 50% |
| Jackson E. Cagle, Jr. | 25% |
| Charles L. Webster, Jr. | 25% |

Among other powers as the managing partner, Eulich had the right, power, and authority to negotiate and execute leases and subleases for the purpose of improving the partnership property, to execute and deal with mortgages, notes, and other instruments of indebtedness in his own name on behalf of the partnership, or in the partnership name. The partnership agreement provides that no partner would receive any salary or drawings for services rendered on behalf of the partnership in a capacity as a partner, but also recognized that each partner would only devote a portion of his time to partnership business since all partners were also involved in other businesses.

The partnership and John F. Eulich d.b.a. the Vantage Co. (hereinafter sometimes referred to as Vantage) entered into a management agreement dated August 15, 1968, which provided

that Vantage would receive for its services, as well as for expenses incurred by it in performance of its services, $110,000 payable $90,000 on or before December 31, 1968, and $20,000 on or before October 1, 1969. The management agreement, in pertinent part, reads as follows:

WHEREAS: Company [Parkway] desires to avail itself of Manager's [John F. Eulich d.b.a. the Vantage Co.] capacity, knowhow, expertise, past general experience, and over-all knowledge of all aspects of the development and management of real property in connection with Company's development of its property located in the Great Southwest Industrial District, Arlington, Texas.

IT HAS BEEN AGREED by the parties hereto as follows:

1. Manager will assist and advise Company with respect to economic planning, feasibility, market analysis and the approach and appeal with respect to development of the above property.

2. Manager will provide Company with techniques regarding financial, accounting and other technical aspects applicable to the development and operation of such property.

3. Manager will assist in the general supervision and administration of Company's operation from the date hereof through October 31, 1969.

Eulich would not have agreed to form the partnership with petitioners as partners without the payment of the aforementioned fee.

The services actually performed by John F. Eulich d.b.a. the Vantage Co. for the partnership were a feasibility study of the office-showroom development which included economic forecasts, market potential, budget and project costs, and anticipated rents; work with the architects on the preliminary plans of the office-showroom complex; work with the construction general contractors with respect to the cost of the project and coordination of the architecture and construction thereof; and the arranging of financing using his own credit to some extent. No portion of the management fee was for managing the property after it was completed. Rather it was for work done at the inception and during the development of the office-showroom complex. John F. Eulich d.b.a. the Vantage Co. was hired because of Eulich's personal expertise in the field of development projects.

Vantage performed similar services for a management fee for other partnerships investing in similar development projects.

The following events took place in connection with the development of the office-showroom project. On September 24, 1968, Eulich purchased 5.255 acres of land (Parkway Plaza). On September 28, 1968, an architect firm was hired to draw up a

plan for the complex and a photographer was hired to photograph the property. On October 31, 1968, a commitment letter for the construction loan was received. In November 1968, the architect firm received several payments for its work. On December 6, 1968, John F. Eulich d.b.a. the Vantage Co. borrowed $1 million from the Prudential Insurance Co. on a 25-year note, a building permit was issued to Dal-Tex Construction Co. to construct the building shell, and a contract was awarded to the Van Co. to finish the various suites of the office-showroom. Construction of the first suite of the office-showroom was completed for occupancy in June 1969, the second suite in July 1969, the third suite in August 1969, and two additional suites in September 1969.

Parkway reported no gross income on its first return covering the period August 1, 1968, through December 31, 1968. It deducted expenses totaling $105,972.51, including the $90,000 paid to Vantage in 1968 which was identified on the partnership return as a "Management Fee." The $105,972.51 loss shown on the partnership return of income was distributed in accordance with the partnership agreement with Jackson E. Cagle, Jr., and Ann Cagle reporting a loss of $51,493 and Charles L. Webster, Jr., and Sylvia Webster reporting a loss of $51,493.13 on their individual returns for 1968.[1]

In his notices of deficiencies to both petitioners, respondent determined that the $90,000 management fee deduction was not allowable because it was not established "that such amount was paid for ordinary and necessary business expenses or that the expenses were incurred in carrying on an existing trade or business."

OPINION

The sole issue presented for decision is whether a $90,000 payment made in 1968 to one of the partners of Parkway Property Co. is currently deductible by the partnership[2] or

[1] Petitioners' share of the expenses of which they were to receive a pro rata allocation was apparently limited to $100,000 since that amount was all they were required to contribute to the partnership through Dec. 31, 1968. The remaining $5,972.51 loss was then apparently distributed according to the partners' general shares in the partnership's profits and loss: $2,986.25 to Eulich; $1,493.13 (rounded off on his return) to Jackson E. Cagle, Jr.; and $1,493.13 to Charles L. Webster, Jr.

[2] Although it is not stated in the record, we assume, from an examination of the tax returns in the record and from the nature of petitioners' claim herein, that the partnership was on the cash receipts and disbursements method of accounting.

whether it must be capitalized. The payment was made in accordance with a contract entered into between Parkway Property Co. and John F. Eulich d.b.a. the Vantage Co. whereby the latter was to provide certain management services to the partnership from August 15, 1968, through October 31, 1969.

Petitioners contend that the payment in question is a guaranteed payment under section 707(c) [3] and that such payment is automatically deductible by the partnership as a section 162(a) [4] expense without regard to the requirements of the latter section. Petitioners alternatively argue that, if this section 707(c) payment must be shown to have met the requirement of section 162(a) to be deductible, such a showing has been made. It is respondent's position that the payment in question is a section 707(a) [5] payment which must meet the requirements of section 162(a) in order to be deductible. Alternatively, respondent argues that, if the payment falls within section 707(c), it still must meet the requirements of section 162(a) to be deductible and that this has not been done since the expenditure in question was capital in nature.

We do not think it necessary to decide whether the payment in question was a section 707(a) payment, a section 707(c) payment, or possibly both since we conclude that it must meet the requirements of section 162(a), whichever subsection is applicable, to be deductible by the partnership.

Petitioners have not contested respondent's assertion that the deductibility of any payments for services under section 707(a) turns upon the satisfaction of the requirements of section 162(a).

---

[3] All Code references are to the Internal Revenue Code of 1954, as amended and as applicable to the taxable year involved, unless otherwise indicated.

SEC. 707. TRANSACTIONS BETWEEN PARTNER AND PARTNERSHIP.

(c) GUARANTEED PAYMENTS.—To the extent determined without regard to the income of the partnership, payments to a partner for services or the use of capital shall be considered as made to one who is not a member of the partnership, but only for the purposes of section 61(a) (relating to gross income) and section 162(a) (relating to trade or business expenses).

[4] SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

(1) a reasonable allowance for salaries or other compensation for personal services actually rendered * * *

[5] SEC. 707. TRANSACTIONS BETWEEN PARTNER AND PARTNERSHIP.

(a) PARTNER NOT ACTING IN CAPACITY AS PARTNER.—If a partner engages in a transaction with a partnership other than in his capacity as a member of such partnership, the transaction shall, except as otherwise provided in this section, be considered as occurring between the partnership and one who is not a partner.

We believe that this assertion by respondent is correct since section 707(a) states only that where a partner engages in a transaction with a partnership in a capacity other than that as a partner, the transaction shall (except as provided otherwise in section 707) be considered as occurring between the partnership and one who is not a partner. There is nary a word about section 162 being inapplicable. In the case where a partnership deals with a third party it is clear that expenditures which are capital in nature are not currently deductible by the partnership. See *Herbert Shainberg,* 33 T.C. 241, 249-251 (1959); *A. Rhett du Pont,* 19 T.C. 377, 381 (1952). A different result should not obtain where the transaction happens to be with one who is a partner.

In support of their position that a section 707(c) payment is automatically deductible by the partnership under section 162(a), petitioners rely upon the legislative history of section 707(c), *F. A. Falconer,* 40 T.C. 1011 (1963), and section 1.707-1(c), Income Tax Regs.[6] With respect to section 707(c), S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., p. 387 (1954), provided:

> Subsection (c) provides a rule with respect to guaranteed payments to members of a partnership. A partner who renders services to the partnership for a fixed salary, payable without regard to partnership income, shall be treated, to the extent of such amount, as one who is not a partner, and *the partnership shall be allowed a deduction for a business expense.* The amount of such payment shall be included in the partner's gross income, and shall not be considered a distributive share of partnership income or gain. A partner who is guaranteed a minimum annual amount for his services shall be treated as receiving a fixed payment in that amount. [Emphasis supplied.]

To the same effect, H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., pp. 68, A226-A227. In *F. A. Falconer, supra* at 1015, a case involving the question whether certain payments were guaranteed payments under section

---

[6] Sec. 1.707-1(c), Income Tax Regs., provides in pertinent part as follows:·

(c) *Guaranteed payments.* Payments made by a partnership to a partner for services or for the use of capital are considered as made to a person who is not a partner, to the extent such payments are determined without regard to the income of the partnership. However, a partner must include such payments as ordinary income for his taxable year within or with which ends the partnership taxable year in which the partnership deducted such payments as paid or accrued under its method of accounting. See section 706(a) and paragraph (a) of §1.706-1. Guaranteed payments are considered as made to one who is not a member of the partnership, only for the purposes of section 61(a) (relating to gross income) and section 162(a) (relating to trade or business expenses). * * *

707(c) with the result that they were taxable to petitioner under section 61(a)(1), we stated:

Section 707(c) has no counterpart in the Internal Revenue Code of 1939. It initially appeared in the Internal Revenue Code of 1954. * * * The legislative history of section 707(c) reveals that it was specifically intended to require ordinary income treatment to the partner receiving guaranteed salary payments and to give a deduction at the partnership level.[3] [Fn. omitted.]

As the legislative history of section 707 relates, the tax treatments of partners and partnerships were confused and at times contradictory prior to the enactment of the 1954 Code. H. Rept. No. 1337, *supra* at p. 65; S. Rept. No. 1622, *supra* at p. 89. Under prior law the tax treatment of compensation paid for a partner's services was generally based upon the so-called aggregate theory of partnerships.[7] Since a person could not be regarded as an employer and an employee at the same time under this approach, a partner's compensation for services or salary was considered only a part of his distributive share of partnership profits or losses. Where partnership profits were sufficient, the compensation was treated as a distributive share of profits, *Estate of S. U. Tilton et al.,* 8 B.T.A. 914 (1927), with the result that such distributions were not proper deductions from income in computing partnership net income. *Augustine M. Lloyd,* 15 B.T.A. 82, 87 (1929).

However, where partnership profits were insufficient to cover the amounts paid as compensation to the partners, such amounts were considered as paid from each partner's capital. To the extent a partner's compensation was considered a return of his own capital, that partner received no taxable income. However, to the extent he was considered to receive the compensation from the capital of his fellow partners, the recipient partner received taxable income and his fellow partners were allowed a deduction for ordinary and necessary business expenses to the extent of their capital depletions. *Augustine M. Lloyd, supra* at 88-89. Congress found application of the aggregate approach in such cases to be "unrealistic and unnecessarily complicated" and thus adopted, in general, the entity approach for tax treatment of compensation to partners for services, at least as far as sections 61(a) and 162(a)

---

[7] Under the aggregate theory the partnership is viewed as merely the aggregate of the activities of the individual partner as distinguished from viewing the partnership as an entity in itself.

were concerned. H. Rept. No. 1337, *supra* at pp. 67-68; S. Rept. No. 1622, *supra* at p. 92.

We have found no case on point and thus we are faced with a question of first impression.[8] We think the legislative history of section 707, and in particular section 707(c), shows only that the entity rather than the aggregate approach, with certain exceptions, was adopted by the 1954 Code in dealing with transactions between a partner and the partnership. We think it implicit in the reports' statements and the Code as enacted that a payment to a partner for services will be viewed as made at the partnership level rather than at the partner level and that the character of that payment must also be viewed at the partnership level in order to determine its proper tax treatment.

Section 707(c) states that for the purposes of sections 61(a) and 162(a) only shall payments to a partner for services, to the extent determined without regard to the income of the partnership, be considered as made to one who is not a member of the partnership. Clearly section 707(c) itself does not require that any guaranteed payment be automatically deductible under section 162(a). Rather, its import is that such a payment for services *may* qualify as a section 162(a) expense of the partnership since the entity theory of partnerships is employed therein to allow that result (i.e., the payment is treated as made to one not a member of the partnership rather than as a payment received partly from profits and partly from other partners and partly from the recipient partner).

Petitioners also rely on a statement in section 1.707-1(c), Income Tax Regs., to the effect that section 707(c) payments are to be included as income in the partner's taxable year within or

---

[8] We note that in *Joe W. Stout,* 31 T.C. 1199 (1959), affirmed in part and remanded sub nom. *Rogers v. Commissioner,* 281 F. 2d.233 (C.A. 4, 1960), the respondent argued that the salaries paid certain partners in that case were for services rendered in connection with the acquisition of capital assets, buildings, and that consequently the taxpayers therein should not be allowed a deduction for the depletion of their capital sustained by the payment of these salaries. The Court did not discuss respondent's theory but held, relying on *Augustine M. Lloyd,* 15 B.T.A. 82 (1929), that the capital depletion sustained by each partner was deductible by him. The case was remanded by the Court of Appeals for consideration as an alternative holding of whether the disbursements in question should be treated as part of the cost of capital assets. *Rogers v. Commissioner, supra* at 236-237. See also the related case of *R. A. Bryan,* 32 T.C. 104 (1959), affirmed in part and remanded 281 F. 2d 238 (C.A. 4, 1960). It should also be noted that the factual situation in *Augustine M. Lloyd, supra,* involved only services required by the day-to-day operations of the business rather than services of a capital nature. These cases, however, were decided under the 1939 Code and thus lend no clearly authoritative insight into the question at hand.

with which ends the partnership taxable year in which the partnership deducted such payments as paid or accrued under its method of accounting. Petitioners apparently wish us to draw the conclusion from this statement that section 707(c) payments are always deductible by the partnership, otherwise they would not always be included in the income of the recipient partner. This statement in the regulations relates to section 706(a)[9] which is a timing provision only. We think that all Congress meant was that guaranteed payments should be included in the recipient partner's income in the partnership taxable year ending with or within which the partner's taxable year ends and in which the tax accounting treatment of the transaction is determined at the partnership level. S. Rept. No. 1622, *supra* at pp. 94, 385, 387. Congress was thus only applying, for this particular purpose, the aggregate rather than the entity approach to the question of the timing of inclusion in the recipient partner's income of section 707(c) payments.

If we were to allow a section 162(a) deduction in the case of a partner's rendering services to his partnership which are capital in nature, it would be the only instance that such a deduction would be allowed for a capital expenditure. We see no reason why employment of the entity theory of partnerships in this facet of partnership taxation should require the automatic deductibility of guaranteed payments and hence make such a holding an anomaly in tax law as far as capital expenditures are concerned. By the above-discussed legislative history we do not, as petitioners' premise would necessarily lead us to conclude, see a conscious attempt on Congress' part to treat partnerships more favorably than other taxpayers. Rather we think that in employing the entity theory, Congress only meant to require inclusion and test deductibility of guaranteed payments in a manner similar to that of other recognized taxable entities because of the simplicity of that approach as opposed to the pre-1954 Code treatment of partners' salaries.

---

[9] SEC. 706. TAXABLE YEARS OF PARTNER AND PARTNERSHIP.

(a) YEAR IN WHICH PARTNERSHIP INCOME IS INCLUDIBLE.—In computing the taxable income of a partner for a taxable year, the inclusions required by section 702 and section 707(c) with respect to a partnership shall be based on the income, gain, loss, deduction, or credit of the partnership for any taxable year of the partnership ending within or with the taxable year of the partner.

In deciding that the section 707(c) payment herein must run the gauntlet of section 162(a) in order to be deductible,[10] we expressly reserve determination of a similar question under section 736(a)(2) and think no inference should be drawn from the decision in the instant case. See sec. 1.736-1(a)(4), Income Tax Regs.

Turning now to the determination of whether the management fee in the instant case is an allowable section 162(a) expense, we look to the nature of the services performed by Eulich rather than to their designation or treatment by the partnership. *Doyle v. Mitchell Brothers Co.,* 247 U.S. 179, 187 (1918); *Harry N. Gifford et al.,* 3 B.T.A. 334, 339 (1926). Despite petitioners' strenuous argument on brief that Eulich performed other services than those which we have listed in our Findings of Fact, we can discern no others from the testimony elicited at trial than those so listed.

We think the feasibility study in the instant case is sufficiently akin to the use survey in *Godfrey v. Commissioner,* 335 F. 2d 82, 85 (C.A. 6, 1964), affirming a Memorandum Opinion of this Court, to hold on the rationale therein [11] that the cost of the study involved here is a capital expenditure. Here, as there, the feasibility study represented the first step in the contemplated development of a capital asset, the office-showroom on Parkway Plaza, and its benefits were obviously expected to extend beyond the year in which the study was made. See also *Louisiana Land & Exploration Co.,* 7 T.C. 507, 514-516 (1946), affirmed on another issue 161 F. 2d 842 (C.A. 5, 1947).

Part of the services performed by Eulich included work with the architects on the preliminary plans of the office-showroom complex and work with the contractors with respect to the cost of the project and coordination of the architecture and construction thereof. It has been consistently held that an expenditure in

---

[10] To the same effect as the holding in the instant case are the following: Willis, Partnership Taxation, sec. 16.04, p. 166 (1971); Kaster, "Real Estate Limited Partnerships," 31st Ann. N.Y.U. Tax Inst. 1799, 1810-1813 (1973); Holdsworth, "Partners' Drawings," 20th Ann. N.Y.U. Tax Inst. 721, 731-734 (1962).

[11] We note that the Court of Appeals in that case discussed the question of deductibility of the expense of the use survey in the context of whether its cost was an ordinary and necessary business expense while this Court considered its deductibility as a nonbusiness expense under sec. 212. However, the different approaches taken do not affect the instant case since sec. 162(a) must be construed in pari materia with sec. 212. Thus if an expense would be capital rather than ordinary and necessary under one, it must also be capital under the other. See *United States v. Gilmore,* 372 U.S. 39, 49 (1963); *Trust of Bingham v. Commissioner,* 325 U.S. 365, 373-374 (1945).

connection with the acquisition of a capital asset, here a building for use in the partnership's proposed business, is a capital investment and hence not deductible as an ordinary and necessary expense of carrying on business. *Acer Realty Co. v. Commissioner,* 132 F. 2d 512, 514 (C.A. 8, 1942), affirming 45 B.T.A. 333 (1941); *Ben Perlmutter,* 44 T.C. 382, 403-405 (1965), affd. 373 F. 2d 45 (C.A. 10, 1967); *Herbert Shainberg,* 33 T.C. 241 (1959). See also *Commissioner v. Idaho Power Co.,* 418 U.S. 1 (1974). In the instant case we do not know all the details of the work performed by Eulich in this regard, but from the meager description of his services given at trial we conclude that his work with the architects and contractors was performed in connection with the acquisition of a capital asset.

Petitioner's reliance upon *Briarcliff Candy Corp. v. Commissioner,* 475 F. 2d 775 (C.A. 2, 1973), reversing and remanding a Memorandum Opinion of this Court is misplaced. The factual circumstances of that case are not sufficiently similar to those of the instant case to give that case any precedential value herein. Here Eulich's contribution related to a tangible asset, the office-showroom complex, while there the contribution related to an intangible asset, the development of a product distribution system.

The last aspect of Eulich's services involved the arranging of financing for the project. Costs of obtaining a loan are capital expenditures which should be capitalized and deducted pro rata over the life of the loan. *Detroit Consolidated Theatres v. Commissioner,* 133 F. 2d 200 (C.A. 6, 1942), affirming per curiam a Memorandum Opinion of the Board of Tax Appeals; *Herbert Enoch,* 57 T.C. 781, 794-795 (1972), and cases cited therein. However, to the extent petitioners can show that the fee, or any part thereof, was an additional cost of borrowed money, rather than a charge for compensation for services rendered in obtaining the loan, such expense can be treated as interest. *Herbert Enoch, supra.* In the instant case Eulich apparently used his personal credit rating in obtaining a construction loan for the partnership.[12] Cf. *M. A. Long,* 8 B.T.A. 737 (1927). However, under the partnership agreement Eulich could make petitioners

---

[12] We say apparently because the facts are unclear on this point. It appears from the record that Eulich first obtained a construction loan for the project and then refinanced the cost of the project with a permanent $1 million loan on which he was responsible for only $500,000, which was the same percentage of the loan as his interest in the partnership.

liable for 25 percent each on any loan he obtained. Since it appears that Eulich was a general partner in Parkway Property Co. he would consequently be personally liable (jointly and severally with the other partners) for the full amount of this loan in any case. Tex. Rev. Civ. Stat. art. 6132, sec. 15 (1970). Thus we think the use of his own credit rating in obtaining the loan added nothing of value to the partnership, unless the loan was without recourse to the partnership (which it does not appear to be). Petitioners have presented no evidence to show that Eulich alone was liable for any loan he obtained for the partnership. Consequently, since we believe that Eulich's services essentially involved the arranging of financing for Parkway, we conclude that the compensation paid him is a capital expenditure.

*Decisions will be entered for the respondent.*