THOMAS M. FAHEY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent THOMAS M. FAHEY AND CAROL P. FAHEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Fahey v. Commissioner
Docket Nos. 1717-76, 1718-76.
United States Tax Court
T.C. Memo 1979-20; 1979 Tax Ct. Memo LEXIS 508; 38 T.C.M. (CCH) 62; T.C.M. (RIA) 79020; January 10, 1979, Filed *508 1. Payments received by Thomas M. Fahey from a partnership in which he was a partner were guaranteed payments under section 707(c), I.R.C. 1954, and were includable in his gross income. 2. Petitioner Thomas M. Fahey is collaterally estopped by his conviction under section 7201, I.R.C. 1954, for the years here involved from denying that his underpayment of tax for the years 1966 and 1967 was due to fraud. Civil fraud penalty sustained. Dante M. Scaccia, for petitioners. John D. Steele, Jr., for respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: In these consolidated cases respondent determined the following income tax deficiencies and additions to tax: Docket
Addition to tax No.
Petitioner
Year
Deficiency
under sec. 6653(b) [1]
1717-76
Thomas M. Fahey
1966
$ 4,040.52
$ 2,326.05
1718-76
Thomas M. Fahey and
1967
3,003.11
1,501.56
Carol P. Fahey
The issues for our decision are: 1. Whether certain partnership payments to petitioner Thomas M. Fahey during 1966 and 1967 constitute taxable income. 2. If so, whether all or part of the *509 resulting underpayments of tax for each year is due to fraud. [2] Some small medical expense deductions also depend upon the outcome of the first issue. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Thomas M. Fahey and Carol P. Fahey, who were married on April 1, 1967, resided in Syracuse, N.Y., when their petitions were filed. Thomas delinquently filed an individual income tax return for 1966 on April 17, 1968, with the director, Internal Revenue Service Center, Andover, Mass.
Thomas and Carol timely filed a joint income tax return for 1967 with the director, Internal Revenue Service Center, Andover, Mass.
On July 19, 1974, in the United States District Court for the Northern District of New York, Thomas was convicted after a jury trial of income tax evasion for the taxable years 1966 and 1967 in violation of section 7201. The conviction *510 was affirmed by the Court of Appeals for the Second Circuit on December 6, 1974. The parties stipulated that the transcripts of the testimony of the sworn witnesses at the criminal trial may be used in this case as if those witnesses had testified at this trial. Witnesses who testified in the criminal case and others gave additional testimony here. The parties further stipulated to the competency of exhibits contained in the record on appeal in the criminal case. These exhibits were received in evidence at this trial subject to the right of either party to make an appropriate motion to strike. No such motion was made. The parties also stipulated that the defense did not contest the issue of tax liability at the criminal trial. Lastly, the legal arguments contained in the record on appeal in the criminal case were stipulated not to be considered as admissions against interest or facts in evidence. In late 1964, petitioner Thomas M. Fahey, a hospital administrator by training and profession, conceived the idea of converting the Syracuse General Hospital, which was being abandoned, into a nursing home. To get bank financing to undertake the project, a partnership known as Walker *511 McKinney Associates, subsequently known as Castle Rest Nursing Home, was formed. Members of the partnership were petitioner, Walker McKinney, Dr. George Simpson, and Theodore G. Metzger. Pursuant to a "Memo of Understanding" dated November 23, 1964, the partners reached an agreement on certain matters. The contributions and profit share of each partner were to be as follows: 3. The partnership shall be set up on the following basis: Walker McKinney, for 85% of cash investment in the project, will have a 42.5% share of all profits from same as hereinafter clarified. George Simpson, for 15% of cash investment in the project, shall have a 7.5% share of all profits in same as hereinafter clarified. For services contributed, Thomas Fahey shall have a 45% share of all profits from the project and Theodore Metzger a 5% share again as hereinafter clarified.
Payouts on the above profit percentages shall be distributed as follows. McKinney and Simpson shall receive first a 20% return on any cash investment, cumulative from time cash enters the partnership. At such time as said 20% has been cumulatively paid to date, the aforesaid will continue to receive the first 20% of return on their *512 cash investment, additional return thereafter going the first 20% to Fahey and Metzger, and thereafter to be divided 50-50. As contemplated in the Memo of Understanding, a more complete partnership agreement was formalized in "Articles of Partnership" dated January 4, 1965. Article 7 of that agreement dealt with profits and losses: ARTICLE 7 PROFITS AND LOSSES 7.1 THOMAS FAHEY or his successor as administrator shall be paid a salary of Twenty Thousand Dollars ($ 20,000) per year, which salary may be drawn by him in monthly installments. Such salary, for purposes of division of partnership's net profits and losses, shall be treated as an expense of the partnership.
7.2 WALKER McKINNEY and GEORGE SIMPSON shall be entitled to receive from the first profits of the partnership a 20% return on their capital account, as it may exist from time to time, which return shall be a first charge on all profits as they occur from year to year and shall be cumulative in nature from the inception of the partnership. 7.3 After the payment of salary as provided in 7.1 above and the distribution of profits with respect to capital accounts as provided in 7.2 above, an amount of yearly net profits equal *513 to the distributions of profits under 7.2 above shall be distributed as follows: THOMAS FAHEY
90%
THEODORE METZGER
10% This distribution shall be on an annual basis and shall not be cumulative. 7.4 The additional net profits and all of the losses of the partnership shall be allocated as follows: Net Profits
Net Losses
WALKER McKINNEY
42.5%
85%
GEORGE SIMPSON
7.5%
15%
THOMAS FAHEY
45.0%
THEODORE METZGER
5.0%
7.5 The distributions provided in 7.3 above and 7.4 above to THOMAS FAHEY are dependent upon his employment as administrator of the Nursing Home except that for each full calendar year of satisfactory service commencing January 1, 1965, and terminating December 31, 1974, he shall be entitled to a 9.0% distribution under 7.3 above up to a maximum of 90% and a 4.5% distribution under 7.4 above up to a maximum of 45% regardless of employment. 7.6 In the event that the partnership shall be liquidated, after December 31, 1974, each partner shall be entitled to his capital account and the excess assets over liabilities shall be distributed among the partners in accordance with the distribution of additional net profits under 7.4 above. In the event that the liquidation shall occur prior to December *514 31, 1974, then the distribution to THOMAS FAHEY shall be limited to his percentage which has been vested regardless of employment and the excess shall be distributed among WALKER McKINNEY and GEORGE SIMPSON in accordance with their then capital account. 7.7 In the event that all capital contributions made by WALKER McKINNEY and GEORGE SIMPSON are repaid to them by the partnership within one year from the date of the acquisition of the General Hospital of Syracuse, then THOMAS FAHEY shall be immediately vested with his maximum distributions under 7.5 above, regardless of employment or years of service. The State regulatory authorities refused to accept Walker McKinney Associates as a nursing home operator because it had been formed as a limited partnership. Accordingly, new "Articles of Partnership" dated November 5, 1965, were agreed to, re-establishing the firm as a general partnership. Article 7 of the earlier agreement was carried over into the new agreement. The partners contemplated that Fahey, who had been involved in a similar project in the past and possessed an extensive background in hospital administration, would contribute largely his expertise and knowledge of the relevant *515 State laws and regulations. He was to put together a financial package acceptable to a consortium of financial institutions and to secure approval of the appropriate regulatory bodies, a task he completed in July or August 1966. When the nursing home became operational, Fahey was to act as administrator, being paid a salary.
Although the partnership agreements provided for a salary for petitioner, he was not paid by the partnership in 1965. The partnership contracted with R. A. Culotti Construction Co. to convert the abandoned hospital facility into the nursing home. As part of the construction contract, the construction company employed Fahey as an architectural consultant.
During parts of 1965 and 1966 Fahey worked as an architectural consultant for R. A. Culotti Construction Co. and was paid a salary of $ 300 per week. The original understanding of the partners was that once the nursing home became operational Fahey would receive a $ 20,000 salary for his services as administrator. When it became evident that the nursing home would not become operational until the spring of 1967 Fahey pressed his request for payments from the partnership. On April 6, 1966, Fahey wrote to Walker *516 McKinney and advised him that Reno Culotti could no longer justify his (Fahey's) salary and requested the partnership to assume the expense of his salary. Fahey noted that if R. A. Cullotti Construction Co. had been able to continue the "salary" it would have been added to construction expense "so that the net expense would have been the same but would have come out of another pocket." The partners agreed that some form of payment for each of the partner's services would be in order. Beginning in April 1966 Fahey drew monthly checks from the partnership to himself. The amount of these checks, when added to the amounts Fahey was receiving from Culotti, would pay Fahey total monthly amounts that would equal about $ 20,000 on an annual basis. On some of the checks he noted that the payment represented salary. The partnership payments came out of capital contributions made by other partners in 1966. Fahey also continued receiving a salary from R. A. Culotti Construction Co. through September 7, 1966. McKinney and Simpson began receiving payments from the partnership for some services in 1967. In September 1966 the actual work of reconstructing and renovating the abandoned hospital *517 began.This task was completed in the spring of 1967. Alan E. Boers of Ernst and Ernst, a national firm of certified public accountants, prepared a W-2 form for Fahey for 1966 reflecting the amount paid by the partnership to Fahey from which State and Federal income tax had been withheld. Ernst and Ernst prepared the partnership return of Walker McKinney for calendar year 1966, and it was signed by Fahey on March 27, 1967. The partnership return reported interest income of $ 2,421.41, expenses of $ 14,994 for salary paid and $ 2,575.06 of other deductions, and a net loss of $ 15,147.65. Schedule K of the return reported Walker McKinney's share of the loss as $ 12,875.50 and George Simpson's share as $ 2,272.15, with nothing for either Fahey or Metzger, and also reported salary paid to Fahey in the amount of $ 14,994. On January 1, 1967, Fahey was rehired by R. A. Culotti Construction Co. to act as a consultant during the conversion of the hospital into a nursing home. Fahey was paid $ 1,666 per month for his consulting work that ended on May 31, 1967, when the nursing home opened its doors and Fahey became its administrator. Beginning in June 1967, Fahey was paid $ 1,666 per month *518 by the partnership which by that time had changed its name to Castle Rest Nursing Home, for services rendered as administrator of the nursing home. Ernst and Ernst prepared the partnership return of Castle Nursing Home for calendar year 1967, and it was signed by Fahey on April 3, 1968. The partnership return reported a loss in gross income of $ 59,663.40, deductions, including salaries paid to partners of $ 11,666.62, totaling $ 152,436.96, and a net loss of $ 212,100.36. Schedule K of the return allocated the net loss $ 180,285.30 to McKinney and $ 31,815.06 to Simpson, with none to either Fahey or Metzger, and also reported salary paid to Fahey only in the amount of $ 11,666.62. On Thomas M. Fahey's delinquently filed 1966 individual income tax return he reported a salary of $ 10,600 from Culotti Construction Co. along with other income of $ 261. Walker McKinney Associates was not mentioned in the return, and no income from the partnership was reported for that year. On pEtitioners' timely filed 1967 joint income tax return Thomas reported a salary of $ 8,330 from R. A. Culotti Construction Co., and Carol reported her wages of $ 7,848.16 from her employers. Petitioners also *519 reported other income of $ 905. Castle Rest Nursing Home was not mentioned in the return, and no income from the partnership was reported for 1967. In 1968 Thomas M. Fahey received $ 21,000 from Castle Rest Nursing Home for his services as administrator. The partnership claimed a salary deduction for this amount in its 1968 tax return, and the petitioners reported this amount as partnership income on their joint income tax return for 1968. Thomas filed personal financial statements with Marine Midland Trust Co. on August 15, 1966, and January 1, 1968, that showed him receiving salary of $ 20,000 per year. On June 2, 1969, petitioners' joint income tax return for the year 1967 was audited by the Internal Revenue Service. During the audit, the examining agent asked Thomas if all income was reported on the 1967 return, and he responded that it was. ULTIMATE FINDING OF FACT Thomas M. Fahey received guaranteed payments from the partnership, Walker McKinney Associates, later known as Castle Rest Nursing Home, during the taxable years 1966 and 1967 in the respective amounts of $ 14,797.80 and $ 11,666.22. OPINION The initial issue is whether payments of $ 14,797.80 in 1966 and $ 11,666.22 *520 in 1967 made by Walker McKinney Associates, a partnership, later known as Castle Rest Nursing Home, to Thomas M. Fahey were taxable income. Respondent determined the payments Fahey received were guaranteed payments under section 707(c) and thus fully taxable. Fahey does not deny that he received the payments, but he claims they were draws or advances against anticipated future profits from the partnership and not income. Thomas M. Fahey was convicted by jury of income tax evasion for 1966 and 1967. The criminal case was a "specific item" case, and the only income Fahey was criminally charged with omitting from his tax returns for those years was the "salary" from the same partnership payments in issue here. On brief, but not in his pleadings, respondent claims the doctrine of collateral estoppel prohibits Thomas M. Fahey from contending that the payments from the partnership were not taxable income because this was the only income he was criminally charged with omitting from his returns, and a necessary component of the guilty verdict was an admission or finding that the omitted payments were taxable income. Respondent's pleadings, however, limit his reliance upon collateral estoppel *521 to the fraud issue. That is not enough to raise the applicability of collateral estoppel as to the character of the income or the amount of the deficiency.Rule 39, Tax Court Rules of Practice and Procedure provides: RULE 39. PLEADING SPECIAL MATTERS A party shall set forth in his pleading any matter constituting an avoidance or affirmative defense, including res judicata, collateral estoppel, estoppel, waiver, duress, fraud, and the statute of limitations. A mere denial in a responsive pleading will not be sufficient to raise any such issue. Whether a criminal conviction in a specific item case may be used by respondent to foreclose the characterization of that item in determining the amount of deficiency in later civil litigation for the same years clearly poses a different question from whether a criminal conviction forecloses the issue of fraud. Since respondent did not raise this collateral estoppel issue in his pleadings, we need not and do not decide it here. [3] *522 *523 Turning to the merits of this issue, if the payments Fahey received from the partnership were "guaranteed payments" under section 707(c), they are includable in his gross income under section 61(a), particularly section 61(a)(1). [4]Falconer v. Commissioner,40 T.C. 1011 (1963). To the extent determined without regard to the income of the partnership, payments *524 to a partner for services shall be considered as made to one who is not a member of the partnership, but only for the purposes of section 61(a) (relating to gross income) and section 162(a) (relating to trade or business expenses). Sec. 707(c). These are socalled "guaranteed payments. " The touchstone for determining guaranteed payments is whether they are payable without regard to partnership income. Whether an amount paid by a partnership to a partner is a "draw" or a "guaranteed payment" is determined by the substance of the transaction rather than its form, and is a factual matter to be judged from all the circumstances. Falconer v. Commissioner,supra at p. 1015. Article 7.1 of the Articles of Partnership dated November 5, 1965, provided that Fahey or his successor as administrator was to be paid a salary of $ 20,000 per year. Such salary, for purposes of dividing the partnership's net profits and losses, was to be treated as an expense of the partnership. The partnership was operating at a loss during 1966 and 1967 with the payments to Fahey coming out of the capital the other partners had contributed. The written partnership agreement leaves no doubt that the payments *525 were made to Fahey without regard to partnership income and, if the written agreement is controlling, were guaranteed payments. Petitioners contend that the November 5, 1965, partnership agreement was orally amended to provide that the payments in issue were to be considered draws or advances against anticipated future profits. According to Fahey's testimony at the criminal trial and here, sometime in 1966 after he had started receiving monthly payments from the partnership, he had asked Walker McKinney's personal attorney, represented to Fahey as a tax specialist, about how his (Fahey's) payments would be treated. Fahey was told not to worry about it at that time because the partners would cover that in a new partnership agreement. When the partnership became operational in about May of 1967, McKinney's attorney suggested that McKinney and Dr. Simpson, who also would be performing services for the partnership, should be compensated therefor; accordingly, McKinney was paid a salary of $ 12,000 as financial director and Simpson $ 2,400 as medical director. McKinney's attorney also advised that, because the partnership would be a losing proposition throughout 1967 and there was no *526 point in the partners incurring any tax liability in those years, whatever payments were made for McKinney's, Simpson's, and Fahey's services could just be treated as draws against future profits. Some months later, to satisfy State Health Department reimbursement regulations, Fahey had McKinney and Simpson sign employment contracts with the partnership in September of 1967, retroactive to some earlier period in the year. Despite agreement by the parties with respect to treating their salaries as draws against future profits, a subsequent falling out between the partners prevented a new written partnership agreement from being executed. As of January 1968 it was apparent that the partnership was becoming profitable and McKinney and his lawyer were changing their tune about Fahey receiving a 45-percent interest in partnership profits; they wanted him to have between a 10-percent and 15-percent interest, and other items also needed to be cleared up in a new partnership agreement. The partners were at a standoff throughout 1968 and no new written partnership agreement was entered into, and it was in that context that petitioners' 1966 and 1967 income tax returns were filed in April *527 of 1968. We are not convinced by a preponderance of the evidence that the amounts paid by the partnership to Fahey in 1966 and 1967 were not guaranteed payments. To begin with, against the language of the formal Articles of Partnership that indicated the payments were made to Fahey without regard to partnership income, an oral amendment claimed by a taxpayer that serves his own interest must be viewed with some suspicion. The only corroboration of Fahey's testimony is confusing testimony of Walker McKinney at the criminal trial. McKinney, a Government witness at that trial, agreed that the November 5, 1965, partnership agreement was effective into 1969, and that through 1967 no other formal or informal agreement was entered into with regard to Fahey's salary. On cross-examination, however, McKinney acknowledged that just prior to September 7, 1967, all four partners met and agreed that the payments to the partners were to be treated as advances and draws against their "partnership interest." In view of the inconsistencies in McKinney's testimony, it is not very helpful.
If McKinney's testimony corroborates Fahey's at all, any amendment of the partnership agreement occurred well after *528 April 17, 1967, the due date for the 1966 partnership return, and thus would be ineffective with respect to 1966 in any event.Under section 761(c), for purposes of section 707(c) and the rest of subchapter K (relating to partners and partnerships): a partnership agreement includes any modifications of the partnership agreement made prior to, or at, the time prescribed by law for the filing of the partnership return for the taxable year (not including extensions) which are agreed to by all the partners, or which are adopted in such other manner as may be provided by the partnership agreement. For 1966 we must therefore look only to the partnership agreement in effect as of April 17, 1967. That was the written agreement dated November 5, 1965. As we have already determined, under that agreement Fahey's payments were guaranteed.That disposes of the issue with respect to 1966. Also in serious conflict with Fahey's version of events is the subsequent treatment of Fahey's payments as salaries on the 1967 partnership return. Fahey signed the partnership return for that year and, though he may not have understood the complexities of partnership taxation, we find it incredible that he or *529 the other partners would not have brought the alleged oral amendment of the partnership agreement to the attention of the accountants who prepared the return. Although we give it little weight, Fahey also filed a financial statement on January 1, 1968, that showed him receiving a salary of $ 20,000 per year. Furthermore, under the partnership agreement, Fahey was to receive a salary of $ 20,000 as administrator. The nursing home became operational in about June of 1967 and petitioner served as administrator. There is no evidence that Fahey's salary arrangement was ever changed--only the vague assertion that payments to the partners would be treated as "draws." In fact Fahey received the salary in 1968 and reported it as such. Also we note that under the partnership agreement, Fahey was guaranteed a salary but had no assurance that he would ever receive a draw; and he apparently had no basis in his partnership interest. See sec. 704(d). We are not convinced that there was an actual amendment of the partnership agreement, particularly with reference to Fahey's salary. And under the written partnership agreement of November 5, 1965, the payments to Fahey in 1967 were also "guaranteed *530 payments." Petitioners have failed to meet their burden of proving that the amounts paid Fahey by the partnership were "draws" rather than "guaranteed payments. " [5] Accordingly, we conclude that the amounts were taxable guaranteed payments and sustain respondent's determination of deficiencies for 1966 and 1967. [6]
The fraud issue is disposed of by our conclusion in Amos v. Commissioner,supra, that under the doctrine of collateral estoppel a conviction for income tax evasion under section 7201 necessarily carries with it the ultimate factual determination that a part of the resulting deficiency for that year was *531 due to fraud. Respondent properly raised the doctrine of collateral estoppel on this question in his answers, and thus Thomas M. Fahey's convictions under section 7201 for 1966 and 1967 foreclose the fraud issue here. We hold that all or part of the underpayments of tax for 1966 and 1967 were due to fraud, and the section 6653(b) fraud addition to tax shall apply with respect to the tax of Thomas M. Fahey for those years. Because of respondent's concession with respect to the liability of Carol P. Fahey for the addition to tax for fraud, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue, unless otherwise specififed.↩
2. In view of sec. 6653(b), last sentence, which provides that the civil fraud addition to tax shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse, respondent conceded that Carol P. Fahey is not liable for any fraud addition to tax in docket No. 1718-76.↩
3. In paragraph 8 of his answers, respondent alleges the indictment and conviction for violating the provisions of section 7201 of the Code and that as a result thereof petitioner is estopped from denying in this case that part of the underpayment of tax for the years 1966 and 1967 is due to fraud. This allegation finds support in Amos v. Commissioner,43 T.C. 50 (1964), affd. 360 F. 2d 358 (4th Cir. 1965). But respondent does not allege in his answer that the conviction estops petitioner from denying in this case that the payments he received were taxable income. Of course, if it did so there would be no reason for a trial of this case, despite the fact that petitioner did not contest the tax liability or the amount thereof in the criminal trial and the jury was given no instructions with respect to the character, from a tax standpoint, of the payments received by Fahey from the partnership. Some support for respondent's argument, if properly raised, can be found in Considine v. Commissioner,68 T.C. 52 (1977), a civil tax fraud case, wherein petitioners had been convicted under section 7206(1) which makes it a crime to willfully make a return under oath which the maker does not believe to be true and correct as to every material fact. In that case we concluded that the conviction estopped petitioner from denying in the civil fraud case that his return was fraudulent and that there was an omission of income from his return of the type on which the conviction was based; but that petitioner was not estopped to deny the amount of the omission or that there was an underpayment of tax since those questions were not essential to the judgment on the section 7206(1) charge. While there appear to be distinctions in the Considine case and this case, we need not decide whether the rationale of that case would support respondent's argument↩ of collateral estoppel in this case, if properly pleaded.
4. Sec. 61(a)(1) provides: SEC. 61. GROSS INCOME DEFINED. (a) General Definition.--Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: (1) Compensation for services, including fees, commissions, and similar items; * * *.↩
5. Implicit in petitioners' argument that Fahey's payments were advances or draws is that they should be treated as loans. But compare sec. 1.731-1(a)(1)(ii), Income Tax Regs.↩ (drawings by a partner against his distributive share treated as current distributions on last day of partnership tax year). Our guaranteed payment determination moots this question. 6. We are not asked to consider whether the payments to Fahey were deductible by the partnership, and we express no opinion thereon. But see Cagle v. Commissioner,63 T.C. 86 (1974), affd. 539 F.2d 409↩ (5th Cir. 1976).