BILLY J. GAINES AND MARTHA C. GAINES, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Gaines v. Commissioner
Docket Nos. 8305-78, 8306-78, 8307-78, 8308-78, 8309-78.
United States Tax Court
T.C. Memo 1982-731; 1982 Tax Ct. Memo LEXIS 16; 45 T.C.M. (CCH) 363; T.C.M. (RIA) 82731; December 21, 1982. S. Ralph Gordon and H. Jere Ford, for the petitioners. Shuford A. Tucker, Jr., for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Calendar Year or
Date Fiscal Year
Petitioners
Ends
Amount
Billy J. Gaines and
Martha C. Gaines
(docket No. 8305-78)
1973
$2,234.66
Lewis E. Gaines, Jr. and
Jackie Gaines
(docket No. 8306-78)
1973
5,711.60
Gaines and Wright
Construction Co., Inc.
2-28-73
$7,875.31
(docket No. 8307-78)
2-28-74
13,336.86
James P. Mather and
Martha T. Mather
(docket No. 8308-78)
1973
3,112.00
Lewis E. Gaines and
Donna A. Gaines
(docket No. 8309-78)
1973
81,762.06
Respondent also determined an addition to tax of $4,088.10 under section 6653(a)[2] in docket No. 8309-78. *22 These consolidated cases generally involve transactions between the various petitioners and certain real estate partnerships. The issues for our decision are as follows: 1. Whether loan fees and other organizational expenses incurred by the various limited partnerships were deductible under section 162(a) or were capital expenditures under section 263; 2. Whether Gaines Properties, the general partner of several limited partnerships, should have reported as income certain guaranteed payments, which were accrued on the books of the limited partnerships and claimed as deductions on thier partnership returns, but never paid to Gaines Properties; 3. Whether Gaines Properties, as a general partner of certain limited partnerships, should have reported as income sums charged to incoming limited partners as imputed interest and accrued by the limited partnerships on their books as deferred interest payable to the general partners; 4. Whether Gaines and Wright Construction Co., Inc., properly deducted certain expenses of a predecessor partnership that the corporation paid; 5. Whether Gaines and Wright Construction Co., Inc., properly deducted certain compensation credited to *23 its officers' accounts; 6. Whether Riverbend Apartments, a partnership (and its partners derivatively) properly recognized as a loss from an involuntary conversion under section 1231 the expenses of constructing an access road; 7. Whether certain payments by a partnership (Belmont Lodge), were includable in the income of its partners or in the income of a corporation (Gaines and Wright Construction Co., Inc.) in which the partners were the shareholders and officers; 8. Whether eight bank deposits were includable in the income of Lewis E. Gaines and Donna A. Gaines in 1973; and 9. Whether any part of any underpayment of any tax in 1973 by Lewis E. Gaines and Donna A. Gaines was due to negligence or intentional disregard of rules and regulations within the meaning of section 6653(a). Certain other issues were raised by the various petitioners in their petitioner, but they have presented no evidence or argument on these items and we assume petitioners have conceded those adjustments. [3]
*24 Because of the multiple parties and issues, we will first make general findings of fact and then make specific findings of fact and a separate opinion on each of the issues that we must decide. All of these issues were properly raised in respondent's notices of deficiency, and petitioners bear the burden of proof on all issues. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). GENERAL FINDINGS OF FACT Petitioners in docket No. 8305-78, Billy J. Gaines and Martha C. Gaines, are husband and wife. Billy is a party only because he filed a joint return with his wife; Martha C. Gaines will be treated as if she were the sole petitioner in their case. Petitioners in docket No. 8306-78, Lewis E. Gaines, Jr., and Jackie Gaines (Eddie and Jackie), are husband and wife. Jackie is a party only because she filed a joint return with Eddie; Eddie will be treated as if he were the sole petitioner in their case. Petitioners in docket No. 8308-78, James P. Mather and Martha T. Mather, are husband and wife. Martha Mather is a party only because she filed a joint return with James; James will be treated as if he were the sole petitioner in their case. Petitioners in *25 docket No. 8309-78, Lewis E. Gaines and Donna A. Gaines, are husband and wife. Donna is a party only because she filed a joint return with Lewis; Lewis will be treated as if he were the sole petitioner in their case. When they filed their petitions in their cases, all of the individual taxpayers resided in Nashville, Tennessee, except Lewis E. Gaines and Donna A. Gaines, who resided in Mt. Juliet, Tennessee. All of the individual taxpayers filed their joint income tax returns for the taxable year 1973 with the Internal Revenue Service Center at Memphis, Tennessee. Lewis and Donna also filed an amended return (Form 1040X) for 1973, which the Internal Revenue Service received on December 23, 1977. Gains & Wright Construction Co., a partnership, was formed on July 1, 1969. Lewis, James, and Eddie were partners in that partnership. On March 12, 1971, Gaines & Wright Construction Co. (the partnership) was incorporated as Gaines & Wright Construction Co., Inc. (G & W, Inc.). G & W, Inc., is the petitioner in docket No. 8307-78. Lewis, James, and Eddie were also shareholders in the corporation. Gaines & Wright Construction Co. filed its final partnership information return for *26 the period January 1, 1971 to March 11, 1971. G & W, Inc., adopted as its first taxable year the period ending February 29, 1972. G & W, Inc., is a corporation chartered in the State of Tennessee. At the time it filed its petition in its case, G & W, Inc., was located in Nashville, Tennessee. G & W, Inc., filed its corporate income tax returns for the taxable years ending February 28, 1973, and February 28, 1974, with the Internal Revenue Service Center at Memphis, Tennessee. In the year 1973, Lewis and James were partners in Gaines Properties. The partnership filed its information return (Form 1065) for the year 1973 with the Internal Revenue Service Center at Memphis, Tennessee. In the year 1973, Lewis was a partner in Willow Creek Apartments (Willow Creek), Walker Springs Apartments (Walker Springs), [4] Chippington Towers, Dawson Village Apartments (Dawson Village), and Westview Tower Association (Westview). Except for Westview, these partnerships filed their information returns (Forms 1065) for the year 1973 with the Internal Revenue Service Center at Memphis, Tennessee. Westview did not file a partnership information return for the year 1973. *27 In the year 1973, Lewis and Martha C. Gaines were partners in Executive Plaza. The partnership filed its information return (Form 1065) for the year 1973 with the Internal Revenue Service Center at Memphis, Tennessee. In the year 1973, Lewis and Gaines Properties were partners in Lincoln Manor Apartments (Lincoln Manor), Brookwood Apartments (Brookwood), Gaines Realty Company (Gaines Realty), and Riverbend Apartments (Riverbend). Gaines Properties was the general partner in each of these partnerships. Each partnership filed its information return (Form 1065) for the year 1973 with the Internal Revenue Service Center at Memphis, Tennessee. In the year 1973, Lewis and Gaines Properties were also partners in Northfield Manor Apartments (Northfield Manor). Lewis was a general partner while Gaines Properties was both a general and a limited partner. The partnership filed its information return (Form 1065) for the year 1973 with the Internal Revenue Service Center at Memphis, Tennessee. In the year 1973, Eddie, Lewis, and James were partners in Belmont Lodge. The record does not indicate whether this was a general or limited partnership, whether there were other partners, *28 or whether (and, if so, where) a partnership information return was filed for Belmont Lodge for the year 1973. H. Jere Ford (Ford) is a licensed Certified Public Accountant and a licensed attorney in the State of Tennessee. [5] Ford has represented Lewis as well as Lewis' business enterprises since the early 1960's. Ford also represented Lewis at the audit which led to this case, and participated extensively in this litigation. Ford, or some other person in his accounting firm, prepared all of the individual tax returns for the year 1973 involved in these cases, and also prepared Lewis' amended 1973 return. Ford, or some other person in his accounting firm, prepared the corporate income tax returns for G & W, Inc., for the corporation's taxable years ending February 28, 1973, and February 28, 1974. Either Ford, or some other person in his accounting firm, prepared the 1973 partnership returns of Willow Creek, Gaines Properties, Executive Plaza, Northfield Manor, Walker Springs, Gaines Realty, and Riverbend. Neither Ford nor anyone else in his accounting firm prepared the 1973 partnership information returns of Lincoln Manor, Brookwood, Chippington Towers, Dawson Village, and *29 Westview. Issue No. 1: Loan Fees and Organizational Expenses
FINDINGS OF FACT In 1973, Lewis was a general partner in Willow Creek with a one-third interest therein. Willow Creek borrowed $1,400,000 from Commerce Union Bank on a nonrecourse basis to finance construction of an apartment complex. The loan was secured by a mortgage on the real estate and planned apartment and required a $14,000 commitment fee to be paid. Willow Creek was required to pay $8,750 to Commerce Union Bank as a commitment fee on another $200,000 loan. Willow Creek was required to pay $14,000 to Kimbrough-Kavanaugh & Associates (K-K-A) as a commitment fee for permanent financing of the apartment complex by Metropolitan Life Insurance Company. Willow Creek was *30 also required to pay another $14,000 to K-K-A as a fee for their consulting services in connection with the permanent financing. Willow Creek reported its income for 1973 using the accrual method of accounting. On its 1973 partnership return, Willow Creek deducted as ordinary and necessary business expenses under section 162(a) those loan fees and other organizational expenses. Respondent disallowed most of those fees as current deductions and amortized the expenditures over the life of the various loans as follows: Item
Claimed
Allowed
Disallowed
Consulting Fees (K-K-A)
$14,000
$700.00
$13,300.00
Loan Costs - Metropolitan
Life
14,000
700.00
13,300.00
Loan Fees & Costs - Commerce
Union Bank
14,000
6,125.00
7,875.00
Loan Closing Costs
5,645
282.26
5,362.74
Legal Fees
1,355
* 855.00
500.00
Total (Increase to ordinary
income/decrease to
$40,337.74
ordinary loss)
In 1973, Lewis and Martha C. Gaines were both general and limited partners in Executive Plaza. Executive Plaza paid K-K-A $7,500 as a loan commitment fee to Metropolitan Life. *31 Executive Plaza also incurred expenses for financing fees to K-K-A of $5,000, and to Third National Bank of another $5,000. Executive Plaza filed its 1973 income tax return using the accrual method of accounting. Executive Plaza deducted these loan fees on its 1973 partnership return. Respondent disallowed these fees as current deductions and amortized the expensitures over the life of the various loans as follows: Amount
Amount
Amount
Item
Claimed
Allowed
Disallowed
Commitment fee --
Metropolitan Life
$7,500
$290.50
$ 7,209.50
Commitment/financing
fee -- K-K-A
5,000
192.78
4,807.22
Commitment/financing
fee -- Third National
Bank
5,000
3,888.85
1,111.15
Total Disallowance (Increase to ordinary
income/decrease to ordinary loss)
$13,127.87
In 1973, Lewis and Gaines Properties were partners in Lincoln Manor. Gaines Properties was the general partner. Lincoln Manor filed its 1973 partnership return using the accrual method of accounting. On its return, Lincoln Manor claimed deductions for development (organizational) expenses, financing fees, and legal expenses.Respondent disallowed these deductions as follows: Amount
Amount
Amount
Item
Claimed
Allowed
Disallowed
Development fees
$60,000.00
$60,000.00
Financing fees
20,803.06
* $43.34
20,759.72
Legal fees to organize
partnership
1,250.00
1,250.00
Total disallowed (Increase to ordinary
income/decrease to ordinary loss)
$82,009.72
*32 In 1973, Lewis and Gaines Properties were partners in Northfield Manor. Gaines Properties was both a general and limited partner, while Lewis was only a general partner. Lewis had a one percent profits interest in Northfield Manor, while Gaines Properties had a 99 percent profits interest, four percent as general partner and 95 percent as limited partner. On February 23, 1973, an advance from mortgage funds of $72,167.18 was approved to pay certain fees and expenses, including financing fees and legal expenses. On its partnership return for 1973, Northfield Manor claimed a deduction for these expenses, which respondent in his notice of deficiency disallowed in their entirety: Amount Claimed
Item
and Disallowed
Loan Costs and Fees
[6] $27,020
Legal Expenses
1,875
Consulting Fees
1,541
*33 In 1973, Lewis and Gaines Properties were partners in Brookwood, with Gaines Properties as the general partner. [7] Brookwood executed a consulting agreement with E.P. Wilbur & Co., Inc., (Wilbur) on December 30, 1973, retaining Wilbur to aid it in the marketing of the limited partnership interests, in obtaining financing, and in operating the apartment complex. Brookwood paid Wilbur $6,184 upon execution of the agreement, and Wilbur received the payments on December 30, 1973, along with notes payable in the aggregate amounts of $23,816, representing a total of $30,000 for payment of consulting fees through December 31, 1976. On its 1973 partnership return, Brookwood claimed deductions for management fees, commitment fees, commissions, and professional fees, which respondent disallowed as follows: Amount Claimed
Item
and Disallowed
Professional Fees
$20,345
Management Fees
19,000
Commissions
8,795
Commitment Fees
* 42,000
*34 In 1973, Lewis was a partner in Walker Springs. See footnote 4. On its 1973 partnership return, Walker Springs claimed deductions for various loan costs and other organizational expenses, which respondent disallowed, as follows: Legal and professional
$14,442
Loan commitment fee
* 48,000
Audit fee
461
Inspection fee
3,131
Title insurance
6,544
Repurchase commitment
24,000
Supervisory expense
6,000
Technical assistance
5,666
Total disallowed (Increase to
ordinary income/decrease to
ordinary loss)
$108,244
In 1973, Lewis and Gaines Properties were partners in Gaines Realty, with Gaines Properties being the general partner. Gaines Realty entered into a consulting agreement with Realty Consultants, *35 Inc., dated December 30, 1973. Under that agreement, Realty Consultants, Inc., was to aid Gaines Realty in obtaining financing and in marketing the limited partnership interests. Pursuant to that agreement, Gaines Realty drew a check payable to Realty Consultants, dated December 31, 1973, in the amount of $39,360. Gaines Realty drew a check payable to the New York law firm of Kronish, Lieb, Shainswit, Weiner & Hellman, dated December 31, 1973, in the amount of $20,000 for legal services in marketing the limited partnership interests. Gaines Realty filed its 1973 partnership return using the accrual method of accounting. On its return, it claimed deductions for certain organizational expenses, legal fees, and the like, which deductions respondent disallowed, as follows: Legal fees
$20,000
Repurchase commitment
26,211
Permanent loan costs
* 32,250
Partners' salaries
14,000
Technical
2,510
In 1973, Lewis and Gaines Properties were partners in Riverbend, with Gaines *36 Properties being the general partner. Riverbend entered into a consulting agreement with Realty Consultants, Inc., dated December 30, 1973. Under that agreement, Realty Consultants, Inc., was to aid Gaines Realty in obtaining financing and in managing the project. Under the terms of the agreement, Riverbend was to pay Realty Consultants, Inc., the sum of $66,625 upon execution of the agreement.
Riverbend filed its 1973 partnership return using the accrual method of accounting. On its return, Riverbend claimed deductions for certain loan costs and other organizational expenses, which deductions respondent disallowed, as follows: Finance fees
$63,000
Legal fees
15,000
Salary and expense
24,000
Consulting expense
25,000
In 1973, Lewis was a partner in Chippington Towers, owning a one percent interest as general partner and a four percent interest as a limited partner. In February of 1973, Chippington Towers obtained nonrecourse financing in the amount of $3,316,500 for the construction of an apartment. In obtaining that loan, Chippington Towers became obligated to pay certain financing fees and loan commitment fees, payable out of the proceeds of the loan. *37 On its 1973 partnership return, Chippington Towers claimed deductions for financing fees, loan commitment fees (FNMA/GNMA) and management fees, which deductions respondent for the most part disallowed, as follows: Item
Claimed
Allowed
Disallowed
Financing fees
$66,330
$33,165
$33,165
FNMA/GNMA fees
58,039
58,039
Management fees
5,000
3,750
1,250
Total disallowed (Increase to ordinary
income/decrease to ordinary loss)
$92,454
In 1973, Lewis was a general partner in Dawson Village. Dawson Village borrowed $607,900 from the Lincoln Mortgage Corporation on a nonrecourse basis to finance construction of an apartment complex. Pursuant to the loan agreement, the sum of $12,158 was withheld as a service charge. Dawson Village claimed and was allowed in 1972 an amortization deduction of $2,026 with respect to the service charge/financing fee of $12,158. Dawson Village filed its 1973 partnership return using the accrual method. On its return, Dawson Village claimed deductions for the balance of the financing fee, amortization of an FNMA fee, and development fees, which deductions respondent for the most part disallowed, as follows: Item
Claimed
Allowed
Disallowed
Development fees
$25,000
$25,000
Financing fee
10,132
* $249
9,883
FNMA fee
165
165
Interest expense
30,384
27,673
[8] 2,711
Total disallowed (Interest to ordinary
income/decrease to ordinary loss)
$37,594
*38 *39 In 1973, Lewis was a partner in Westview and had a one percent profits interest in the partnership. Westview prepared but did not file its partnership return for 1973. On its unfiled return, Westview claimed deductions for certain loan costs and other organizational expenses, which respondent in his statutory notice to Lewis for the most part disallowed, as follows: Item
Claimed
Allowed
Disallowed
Rent up fees
$56,000
$28,000.00 ** $28,000.00
Consulting expenses
10,000
7,500.00 ** 2,500.00
FNMA/commitment fee
38,142
* 158.92
37,983.08
Payments to partner
16,000
8,000.00 ** 8,000.00
Construction loan
interest and points [9]
126,284
41,655.60
84,628.40
Total disallowed (Increase to ordinary
income/decrease to ordinary loss)
$161,111.48
*40 In 1973, Lewis and James were partners in Gaines Properties. In addition to the adjustments to the Gaines Properties' income to reflect the guaranteed payments (Issue No. 2 below), its reduced share of distributive losses in other partnerships discussed above, [10] and interest income (Issue No. 3 below), Gaines Properties also claimed a deduction on its partnership return in the amount of $166,312 for consulting fees, which deduction respondent disallowed in its entirety. Gaines Properties used the cash method of accounting. Petitioners introduced no evidence to show when such expenditures for consulting expenses were made, to whom they were paid, or for what purposes they were incurred. In 1973, *41 Lewis and Martha C. Gaines were 50 percent partners in Realty Advisors. During 1973, Realty Advisors spent $406.04 on various books about real estate and construction. During 1973, Realty Advisors also spent $263.16 for air fare and hotel expense for Martha C. Gaines and her son on a trip to Dallas. The record does not establish the purpose of this trip. Realty Advisors' unfiled partnership return was not introduced into evidence.The record does not indicate whether Realty Advisors used the cash method or the accrual method of accounting. Realty Advisors' partnership tax return for 1973 was not filed and respondent's determination in the notice of deficiency was based on the unfiled return. In that unfiled return, Realty Advisors claimed deductions for supplies in the amount of $406.04, and travel expense in the amount of $263.16, which respondent disallowed. Respondent also disallowed a deduction for payroll and travel expenses in the amount of $2,382.50 on the ground that it represented nondeductible organization expenses of Westview. Nothing in the record indicates that Realty Advisors was a partner, either limited or general, in Westview. The record does not establish *42 that $263.16 for travel expense deducted by Realty Advisors was an ordinary and necessary expense under section 162. Issue No. 1: Loan Fees and Organizational Expenses
OPINION Petitioners in these cases were partners in numerous partnerships engaged in the construction of apartment buildings. Respondent disallowed various deductions claimed at the partnership level for loan costs, finance fees, management fees, and legal expenses, on the ground that these expenses constituted capital expenditures under section 263 rather than currently deductible expenses under section 162(a). Respondent determined that various loan costs and financing fees should be capitalized and amortized over the life of the various loans. Respondent determined that the organizational expenses of the various partnerships constituted nondeductible capital expenditures. Consequently, respondent increased the various partners' distributive shares of partnership income (or decreased their distributive shares of partnership losses) to reflect the disallowance of these deductions at the partnership level.Petitioners claim that all of these expenditures constituted ordinary and necessary business expenses *43 under section 162(a). Petitioners have the burden of proof on this issue and have failed to carry their burden. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). First, as to the management fees, respondent determined that they were incurred in the acquisition of the apartment buildings of the various partnerships and therefore constituted capital expenditures.The determination of whether a so-called management fee is allowable as a deduction under section 162(a) depends upon the nature of the services performed rather than the designation or treatment of such services by the partnership. Doyle v. Mitchell Bros. Co.,247 U.S. 179, 187 (1918); Cagle v. Commissioner,63 T.C. 86, 96 (1974), affd. 539 F. 2d 409 (5th Cir. 1976); Gifford v. Commissioner,3 B.T.A. 334, 339 (1926). As this Court stated in Cagle,supra at 96-97: It has been consistently held that *44 an expenditure in connection with the acquisition of a capital asset, here a building for use in the partnership's proposed business, is a capital investment and hence not deductible as an ordinary and necessary expense of carrying on a business. Acer Realty Co. v. Commissioner,132 F. 2d 512, 514 (C.A. 8, 1942), affirming 45 B.T.A. 333 (1941); Ben Perlmutter,44 T.C. 382, 403-405 (1965), affd. 373 F. 2d 45 (C.A. 10, 1967); Herbert Shainberg,33 T.C. 241 (1959). See also Commissioner v. Idaho Power Co.,418 U.S. 1 (1974). * * * Petitioners argue that some of the management fees claimed as deductions involved the actual management of the apartment complex after completion. Petitioners did not testify nor produce any other evidence regarding the management services performed. There is no basis in the record for holding that any of the management fees involved management of the apartments after construction. Petitioners have failed to show that they are entitled to a deduction in an amount greater than respondent allowed. Respondent *45 also disallowed deductions for loan costs and financing fees, again on the ground that they constituted capital expenditures. Generally, the cost of obtaining a loan is a capital expenditure that must be capitalized and deducted pro rata over the life of the loan. Cagle v. Commissioner,supra,63 T.C. at 97; Detroit Consolidated Theatres v. Commissioner,133 F. 2d 200 (6th Cir. 1942), affg. per curiam a Memorandum Opinion of the Board of Tax Appeals; Enoch v. Commissioner,57 T.C. 781, 794-795 (1972), and cases cited therein. [11] Petitioners have not testified nor have they presented any other evidence to show that the deductions claimed for finance fees and loan costs were anything other than the costs of obtaining the loans. Petitioners have failed to show they are entitled to a deduction in an amount greater than respondent allowed. *46 Finally, respondent disallowed deductions claimed at the partnership level for legal expenses and other costs incurred in organizing and marketing the partnerships on the ground that they constituted capital expenditures. The law is clear that "Expenditures incurred in connection with the organization and syndication of limited partnerships are capital in nature and, therefore, not currently deductible." Kimmelman v. Commissioner,72 T.C. 294, 304 (1979); Cagle v. Commissioner, 539 F. 2d at 415; Meldrum & Fewsmith, Inc. v. Commissioner,20 T.C. 790, 807 (1953), affd. 230 F. 2d 283 (6th Cir. 1956).
Petitioners did not testify nor did they produce any evidence to rebut respondent's determination that the disallowed expenses were incurred in organizing and marketing the partnerships. Instead, petitioners argue that Congress in 1976 enacted a specific provision, section 709, [12] disallowing a deduction for partnership organization and syndication expenses, and made such new provision effective prospectively only, and therefore *47 deductions for earlier years must be allowed. In effect, petitioners argue that Congress recognized a loophole but closed it prospectively only, and therefore the claimed deductions for the earlier periods must be allowed. Petitioners are in error. *48 Section 709 was enacted as part of the Tax Reform Act of 1976, and was designed to clarify the treatment of partnership syndication and organization fees. Pub. L. 94-455, § 213(b)(1), 90 Stat. 1547, 1976-3 C.B. (Vol. 1) 23. Prior to 1976, "It [had] been the common practice for limited partnerships to deduct the payments made to the general partner for the services he rendered in connection with the syndication and organization of the limited partnership," and, thus, many partnership organizers would label the organization and syndication expenses due the general partners as "guaranteed payments" under section 707(c) of the Code and deduct these expenses, claiming that section 707(c) guaranteed payments were automatically deductible without regard to the capital expenditure rules of section 263. H. Rept. No. 94-658 (1976), 1976-3 C.B. (Vol. 2) 812-813; S. Rept. No. 94-938 (1976), 1976-3 C.B. (Vol. 3) 131. However, even before the 1976 Act, both the Internal Revenue Service and this Court had ruled that the deductibility of section 707(c) guaranteed payments was still subject to the capital expenditure rules of section 263. Rev. Rul. 75-214, 1975-1 C.B. 185; *49 Cagle v. Commissioner,63 T.C. 86 (1974). In the Tax Reform Act of 1976 Congress ratified these holdings, stating "The committee believes that the correct interpretation of section 707(c) is the interpretation given that subsection by the Internal Revenue Service and the Tax Court…." H. Rept. No. 94-658, supra at 121, 1976-3 C.B. (Vol. 2) at 813; S. Rept. No. 94-938, supra at 93, 1976-3 C.B. (Vol. 3) at 131.Section 707(c) was amended to make explicit reference to section 263. At the same time section 709 was adopted in part as statutory clarification (in regard to partnership organization and syndication fees) and in part as remedial legislation (in regard to amortization of organization fees). As originally reported by the House, the legislation provided for a flat ban on deductions for organization and syndication expenses: The bill adds a new provision (sec. 724) which provides that no deduction shall be allowed to a partnership or to any partner under the partnership tax provisions (Subchapter K of the Code) for any amounts paid *50 or incurred to organize a partnership or to promote the sale of, or to sell, an interest in the partnership…. Since the committee believes that these provisions merely declare and clarify existing law, They apply to all taxable years to which the Internal Revenue Code of 1954 applies. (Emphasis added.) H. Rept. No. 94-658 at 121-122, 1976-3 C.B. (Vol. 2) at 813-814. The Senate provision, ultimately adopted as section 709, revised the House position by permitting partnerships a 60-month amortization deduction for organization expenses comparable to that allowed corporations under section 248. Sec. 709(b); S. Rept. No. 94-938, supra at 94, 1976-3 C.B. (Vol. 3) at 132. The Senate Report notes that "The House bill is substantially the same as the committee amendment except that the House bill did not allow the 60-month amortization for organizational expenses." S. Rept. No. 94-938, supra at 94, 1976-3 C.B. (Vol. 3) at 132. [13]
*51 Thus, from the legislative history, it is clear that Congress did not view prior law as permitting the type of deductions claimed here by petitioners, much less that Congress intended this legislation to indicate Congressional ratification of a perceived loophole. See footnote 13. Our holding in Kimmelman v. Commissioner,supra, reinforces our view that the tax law prior to 1976, before adoption of section 709, did not permit a deduction for expenses of organizing and syndicating a partnership. 72 T.C. at 304-305. The law does not allow the deduction claimed, and petitioners have failed to show that the claimed deductions are anything other than organizational and syndication expenses. They are not entitled to a deduction in an amount greater than respondent has allowed. Realty Advisors deducted under section 162 the costs of various books on real estate and construction. Respondent determined that these expenses were capital expenditures and not deductible under section 162. Petitioners introduced into evidence receipts for the payment of such books but introduced no other evidence to show the nature and purpose of these books, nor the *52 "useful life" of these books (e.g., the time until such books are obsolete). Accordingly, petitioners have failed to carry their burden of proof. To summarize, with respect to all of the section 162(a) deductions claimed by the various partnerships and disallowed by respondent as capital expenditures, petitioners have failed to carry their burden to show that they are entitled to a deduction in any amount greater than respondent allowed. Consequently, we find for respondent on this issue. Issue No. 2: Guaranteed Payments
FINDINGS OF FACT On their partnership returns for the year 1973, Lincoln Manor, Brookwood, Gaines Realty, and Riverbend each claimed as deductions certain guaranteed payments to partners. Gaines Properties was a general partner in each of these partnerships. The amounts claimed by the limited partnerships as deductions for guaranteed payments to partners and Gaines Properties' share of those guaranteed payments were as follows: Gaines Properties'
Partnership
Amount Claimed
Share
Lincoln Manor
$74,131.26
$23,750.00
Brookwood
109,666.00
88,666.00
Gaines Realty
125,881.00
91,006.00
Riverbend
216,087.00
104,168.50
Each *53 of the four limited partnerships accrued and claimed deductions for these guaranteed payments. Lincoln Manor, Brookwood, Gaines Realty, and Riverbend all used the accrual method of accounting on their 1973 partnership returns. Gaines Properties reported its income using the cash receipts and disbursements method of accounting. Gaines Properties never received any of the guaranteed payments and did not report them in its income. Respondent determined that Gaines Properties should have reported as income the guaranteed payments accrued and deducted by the four limited partnerships. Respondent, however, disallowed portions of the deductions that the four limited partnerships claimed for these guaranteed payments, on the ground that some portions were capital expenditures and not currently deductible. [15]
*54 Issue No. 2: Guaranteed Payments
OPINION Lincoln Manor, Brookwood, Riverbend, and Gaines Realty accrued and claimed deductions on their partnership returns for certain "guaranteed payments," including guaranteed payments to Gaines Properties, a general partner of each limited partnership. Gaines Properties never received these guaranteed payments. Respondent disallowed to the limited partnerships portions of the claimed deductions for guaranteed payments, including some of the deductions attributable to the guaranteed payments to Gaines Properties. Notwithstanding this partial disallowance of deductions at the partnership level, respondent determined that the entire amount of the guaranteed payments to Gaines Properties, including the portion disallowed as deductions at the partnership level, should be included in Gaines Properties' income. Petitioners argue that the guaranteed payments that Gaines Properties did not receive, or at least such payments to the extent that the deductions therefor were disallowed at the partnership level, were not includable in Gaines Properties' income. Respondent argues that Gaines Properties' share of these guaranteed payments was *55 includable in its income regardless of the fact that the deduction was partially disallowed at the partnership level and regardless of the fact that Gaines Properties, which used the cash method of accounting, never received the payments. We agree with respondent.
Section 707(c), as in effect in 1973, provided: To the extent determined without regard to the income of the partnership, payments to a partner for services or the use of capital shall be considered as made to one who is not a member of the partnership, but only for the purposes of section 61(a) (relating to gross income) and section 162(a) (relating to trade or business expenses). This case does in fact involve "guaranteed payments" to a partner within the meaning of section 707(c) of the Code. The fact that no actual payments were made does not affect the status of these transactions as section 707(c) guaranteed payments. "[D]espite the use of the word 'payments' in both § 707(c) and the Regulations thereunder, it is clear that no actual payment need be made; if the partnership deducts the amount under its method of *56 accounting, the 'recipient' partner must include the amount in income in the appropriate year." W. McKee, W. Nelson and R. Whitmire, Federal Taxation of Partnerships and Partners (hereinafter McKee, Nelson and Whitmire), par. 13.03[2], pp. 13-16. See also Pratt v. Commissioner,64 T.C. 203, 213 (1975), affd. on this point and revd. on other grounds 550 F. 2d 1023 (5th Cir. 1977); sec. 1.707-1(c), Income Tax Regs. The parties stipulated that each of the four limited partnerships deducted "guaranteed payments." The partnership agreements of Brookwood and Gaines Realty expressly stated that certain payments to partners "shall constitute guaranteed payments within the meaning of section 707(c) of the Code." While the descriptions of such payments in the partnership agreements are not binding upon us ( Doyle v. Mitchell Bros. Co.,247 U.S. 179, 187 (1918)), the payments referred to in those two partnership agreements are clearly fixed sums determined without regard to partnership income. See Sec. 707(c); Sec. 1.707-1(c), Income Tax Regs. Furthermore, it is equally clear that the payments *57 to the partners were for services in their capacities as partners. [16] Respondent in his notices of deficiency determined that these payments were in fact guaranteed payments under section 707(c), and petitioners did not dispute this determination. Accordingly, we hold that the payments here were guaranteed payments within the meaning of section 707(c). The statutory language of section 707(c) addresses only the character of the guaranteed payments and not the timing. Respondent's regulation under section 707(c), section 1.707-1(c), Income Tax Regs., addresses the timing question, as follows: *58 Payments made by a partnership to a partner for services or for the use of capital are considered as made to a person who is not a partner, to the extent such payments are determined without regard to the income of the partnership. However, a partner must include such payments as ordinary income for his taxable year within or with which ends the partnership taxable year in which the partnership deducted such payments as paid or accrued under its method of accounting. See section 706(a) and paragraph (a) of § 1.706-1. As the regulation makes clear, the statutory authority for the timing of the inclusion of these guaranteed payments is section 706(a), which provides: In computing the taxable income of a partner for a taxable year, the inclusions required by section 702 and section 707(c) with respect to a partnership shall be based on the income, gain, loss, deduction, or credit of the partnership for any taxable year of the partnership ending within or with the taxable year of the partner. (Emphasis supplied.) The separate reference of section 707(c) guaranteed payments in *59 the timing provisions of section 706(a) was explained by the Senate Report as simply-- to make clear that payments made to a partner for services or for the use of capital are includible in his income at the same time as his distributive share of partnership income for the partnership year when the payments are made or accrued…. (S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess. 385 (1954)). In Cagle v. Commissioner,63 T.C. 86 (1974), affd. 539 F. 2d 409 (5th Cir. 1976), we held that includability and deductibility of guaranteed payments are two separate questions, and specifically that guaranteed payments are not automatically deductible simply by reason of their being included in the recipient's income. In Cagle, we stated 63 T.C. at 95: We think that all Congress meant was that guaranteed payments should be included in the recipient partner's income in the partnership taxable year ending with or within which the partner's taxable year ends and in which the tax accounting treatment of the transaction *60 is determined at the partnership level. S. Rept. No. 1622, supra at pp. 94, 385, 387. We believe our statement in Cagle is an accurate description of the Congressional intent. We have found nothing in the statutory language, regulations, or legislative history to indicate that includability in the recipient partner's income was intended to be dependent upon deductibility at the partnership level. Petitioners seem to argue that there is a patent unfairness in taxing them on nonexistent income, namely income that they have neither received nor benefitted from (e.g. through a tax deduction at the partnership level). Their argument has a superficial appeal to it, but on closer analysis must fail. Except for certain very limited purposes, guaranteed payments are treated as part of the partner's distributive share of partnership income and loss. Sec. 1.707-1(c), Income Tax Regs. For timing purposes guaranteed payments are treated the same as distributive income and loss. Sec. 706(a); sec. 1.706-1(a) and sec. 1.707-1(c), Income Tax Regs. *61 A partner's distributive share of partnership income is includable in his taxable income for any partnership year ending within or with the partner's taxable year. Sec. 706(a). As is the case with a partner's ordinary distributive share of partnership income and loss, any unfairness in taxing a partner on guaranteed payments that he neither receives nor benefits from results from the conduit theory of partnerships, and is a consequence of the taxpayer's choice to do the business in the partnership form. [17] We find no justification in the statute, regulations, or legislative history to permit these petitioners to recognize their income pro rata as deductions are allowed to the partnership. See also Pratt v. Commissioner,64 T.C. 203, 213 (1975), affd. on this ground 550 F. 2d 1023 (5th Cir. 1977). We hold for respondent on the guaranteed payments issue. Issue No. 3: Interest Income
FINDINGS OF FACT During 1973, Lewis and James were partners *62 in Gaines Properties, both being general partners. Gaines Properties and Lewis were partners in Brookwood Apartments, with Gaines Properties being a general partner. Brookwood's amended limited partnership agreement provided that the limited partners could make their capital contributions in installments, with certain later installments being conditioned upon progress in construction of the apartments. Included in each installment was imputed interest at the rate of eight and one-half percent on the remaining unpaid installments. Finally, the agreement provided "Interest included in the Capital Contribution shall be separately allocated and paid to the General Partners." On the balance sheet attached to its 1973 partnership return, Brookwood reported the sum of $29,449 as a liability for deferred interest income. During 1973, Lewis was a general partner in Walker Springs, but Gaines Properties was not a partner in Walker Springs. See footnote 4. Walker Springs' amended limited partnership agreement also permitted the limited partners to pay their capital contributions in installments.Similarly, as with Brookwood, the amended agreement provided for imputed interest, here at nine *63 percent per annum, on the unpaid installments. Finally, the agreement provided that "The General Partners shall be paid an incentive management fee of all Cash Receipts of the Partnership through December 31, 1974." [18] On the balance sheet attached to its 1973 partnership return, Walker Springs reported the sum of $50,696 as an "other liability," which was explained on the attached schedule as "interest collected in advance, unearned." Neither Gaines Properties on its 1973 partnership return nor Lewis on his original or amended individual return for 1973 reported this imputed *64 interest as income. In his notice of deficiency, respondent determined that "Gaines Properties constructively received interest income of $54,797 which was not reported on the return." [19]
This imputed interest, payable to the general partners of Brookwood and Walker Springs, was never paid because the partnerships did not have sufficient money to make payment. If money had been available, Lewis (as general partner of Walker Springs and as general partner of Gaines Properties, Brookwood's general partner) could have issued checks in payment of the interest. However, Brookwood and Walker Springs did not have enough income to meet operating expenses, and the general partners lost the partnership business through foreclosure proceedings. Issue No. 3: Interest Income
OPINION In his notice of deficiency, respondent determined that Gaines Properties *65 (and Lewis and James derivatively) "constructively received interest income." This "interest income" represents the liability accounts reflected on the books of Brookwood and Walker Springs for deferred interest, which respondent argues constitutes the interest imputed on the capital contributions of the limited partners. Respondent argues that because Lewis was in control of both partnerships, he had the power to compel payment of the interest and therefore Gaines Properties constructively received the interest income. Petitioners argue that Brookwood and Walker Springs lacked the funds to make the interest payments and therefore there was no constructive receipt by Gaines Properties or petitioners. We agree with the petitioners.
A cash basis taxpayer such as Lewis or James (or Gaines Properties) must include in his income amounts which he has received, actually or constructively. See. 1.451-1(a), Income Tax Regs. See Corliss v. Bowers,281 U.S. 376 (1930). Section 1.451-2(a), Income Tax Regs. states: Income although not actually reduced *66 to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given.However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. Whether the taxpayer has the necessary control over the income to constitute constructive receipt is a question of fact. Avery v. Commissioner,292 U.S. 210 (1934); Willits v. Commissioner,50 T.C. 602, 612-613 (1968); Basila v. Commissioner,36 T.C. 111, 116 (1961). However, even though the taxpayer may formally have power to compel a payment, there is no constructive receipt where the payor lacks the funds to make the payments. Estate of Noel v. Commissioner,50 T.C. 702, 706-707 (1968); Jacobs v. Commissioner,22 B.T.A. 1166, 1169 (1931). See also Gullett v. Commissioner,31 B.T.A. 1067, 1069 (1935). Here *67 the general partners never received these imputed interest payments. Furthermore, the Brookwood and Walker Springs partnerships lacked sufficient funds to make the payments. In fact, neither partnership was producing sufficient income to meet operating expenses, and petitioners eventually lost both partnerships through foreclosure proceedings. We have found as a fact that imputed interest payments were not made to the general partners because the partnerships lacked sufficient funds. Accordingly, there was no constructive receipt and we find for petitioners on this issue. [20]
*68 Issue No. 4: Deductibility by Corporation of Expenses of Prior Partnership
FINDINGS OF FACT The partnership of Gaines and Wright Construction Company was incorporated on March 12, 1971 as Gaines and Wright Construction Company, Inc. (G & W, Inc.) Lewis, James, and Eddie were partners in the predecessor partnership and shareholders in the corporation. During the taxable years ending February 28, 1973, and February 28, 1974, G & W, Inc., incurred and paid certain expenses and costs relating to a house constructed and sold by Gaines and Wright Construction Company (the partnership). On its corporate income tax returns for those taxable years, G & W, Inc., claimed deductions for those expenses. In his notice of deficiency, respondent disallowed the claimed deductions in the amount of $2,203.68 for the taxable year ending February 28, 1973, and $8,000 for the tax year ending February 28, 1974, "because the payments were not your [G & W, Inc.] expenses but those of Gaines and Wright, a partnership." None of the records relating to the incorporation of G & W, Inc., were introduced into evidence. The record is insufficient to establish that G & W, Inc., assumed the expenses *69 and obligations of the predecessor-partnership, Gaines and Wright Construction Company.[21]
Issue No. 4: Deductibility by Corporation of Expenses of Prior Partnership
OPINION Respondent disallowed certain deductions claimed by G & W, Inc., on the ground that they were expenses of the predecessor partnership and not an ordinary and necessary business expense of the corporation. The law in this area is clear. As we stated in David R. Webb, Co. v. Commissioner,77 T.C. 1134, 1137 (1981), on appeal (7th Cir. Feb. 5, 1982): It is well settled *70 that the payment of an obligation of a preceding owner of property by the person acquiring such property, whether or not such obligation was fixed, contingent, or even known at the time such property was acquired, is not an ordinary and necessary business expense. Rather, when paid, such payment is a capital expenditure which becomes part of the cost basis of the acquired property. Such is the result irrespective of what would have been the tax character of the payment to the prior owner.(Emphasis in original.) The Webb opinion cites a plethora of cases for this proposition. 77 T.C. at 1137-1138. Two of the cases cited in Webb specifically disallowed deductions to corporations for expenses of their predecessor partnerships on the ground that such expenditures constituted capital expenditures. United States v. Smith,418 F. 2d 589, 596 (5th Cir. 1969); Caldwell & Co. v. Commissioner,26 B.T.A. 790, 793-794 (1932), affd. per curiam 65 F. 2d 1012 (2d Cir. 1933). [22]
*71 Petitioners cite United States v. Smith,supra, for the proposition that the corporation may be allowed a deduction under section 162 if its primary purpose is other than the acquisition of property (e.g. the partnership assets). [23]418 F. 2d at 597. That argument does not help petitioners. The Fifth Circuit in Smith held that as a threshold requirement there must be an actual assumption of the partnership obligation by the successor corporation. United States v. Smith,418 F. 2d at 596. [24] We have found the record inadequate to establish that the corporation G & W, Inc., assumed the obligations of the predecessor partnership. Furthermore, even if there had been such an assumption, the record is wholly inadequate to show that the purpose for such "assumption" was anything other than the acquisition of the assets of the partnership. We sustain respondent's determination that these expenses were not deductible by G & W, Inc. *72 Respondent also determined in his notice of deficiency that Eddie had received a constructive dividend of $2,203.68 as a result of payment by G. & W, Inc. Respondent apparently determined that this was a personal liability (or a liability upon which Eddie had been liable as a partner in the predecessor partnership), and that payment by the corporation of his personal obligation constituted a constructive dividend to him. Eddie contested this determination in his petition, arguing that if the expenses were deductible by G & W, Inc., then they were not dividends to him. Respondent determined that the liability was Eddie's personal obligation that was discharged when the corporation paid it. The payment by a corporation of an obligation of its shareholder generally constitutes a dividend to the shareholder. United States v. Smith,supra. Eddie presented no evidence on this issue, and accordingly, we sustain respondent's determination that Eddie received a constructive dividend of $2,203.68. Issue No. 5: Deductibility of Salaries - Bonuses
FINDINGS OF FACT
*73 On its income tax return for the taxable year ended February 28, 1973, G & W, Inc., claimed a deduction for compensation of officers in the amount of $24,000, reflecting $8,000 compensation each to Lewis, Eddie, and James. These amounts were posted in November of 1973 [25] in G & W, Inc.'s ledger as credits to the accounts of Lewis, Eddie, and James. These credits were made to general accounts receivable due and owing to the corporation from Eddie, Lewis, and James. These credits for compensation were offset against various draws made by Eddie, Lewis, and James which had been debited to their accounts during 1972 and up to February of 1973. During the corporation's taxable year ending February 28, 1973, Eddie withdrew $4,773.22, Lewis withdrew $10,250, and James withdrew $10,600. A copy of a Form 941, FICA wage reporting form, for G & W, Inc., for the quarter ended September 1973, reports FICA wages in the amounts of $5,800, $8,000, and $8,000 for Eddie, Lewis, and James, respectively. On their 1973 income tax returns, Lewis, Eddie, and James each reported compensation income from G & W, Inc., of at least the $8,000 claimed as a deduction by the corporation on its return for *74 its taxable year ended February 28, 1973. The determination that Lewis, Eddie, and James were entitled to compensation for the corporation's year ending February 28, 1973, was made sometime after the close of the taxable year by its accountant, Ford, in the course of his audit of the corporation's books. This audit took place sometime in March or April of 1973, and prior to May 15, which Ford identified as the date on which the return was due. [26] Ford prepared adjusting journal entries crediting the various accounts receivable for the officers to reflect the determination of compensation due. Ford's work papers were not introduced into evidence. Ford was not the bookkeeper *75 and did not know when the bookkeeper made the journal entries. The record does not indicate when the bookkeeper made the adjusting journal entries in G & W, Inc.'s corporate books. The credits for compensation were not posted in the corporate accounts of Lewis, Eddie, and James until November of 1973. There is no evidence in the record of any corporate resolution or other corporate action in regard to these credits for compensation.There is no evidence as to Ford's authority in regard to determining compensation for Lewis, Eddie, and James. Issue No. 5: Deductibility of Salaries - Bonuses
OPINION Petitioner G & W, Inc., claimed a deduction for compensation to its shareholder-officers, Lewis, James, and Eddie, for the fiscal year ending February 28, 1973, which respondent disallowed. Petitioner argues that since the salaries credited to the officers' drawing accounts in November 1973 offset draws actually made by those officers during the corporation's taxable year, such amounts *76 were actually "paid" by the corporation and "received" by the officers during the corporation's taxable year. Respondent argues that since those amounts were not credited on the books of the corporation until November of 1973, no deduction is allowed because of section 267(a)(2). We agree with respondent.
Section 267(a)(2)[27] disallows otherwise allowable deductions for certain expenses payable to related taxpayers where the expenses are not paid or otherwise includable in the payee's income within two and one-half months of the close of the taxpayer's taxable year. All three of the requisite facts specified in subparagraphs (A) through (C) of section 267(a)(2) must exist before a deduction is barred. Hyplains Dressed Beef, Inc. v. Commissioner,56 T.C. 119, 125 (1971); Lacy Contracting Co. v. Commissioner,56 T.C. 464, 467-468 (1971); Young Door Co., Eastern Division v. Commissioner,40 T.C. 890, 893 (1963). Petitioner has not disputed respondent's determination that the requirements of subparagraphs (B) and (C) have been met. *77 [28] The crux of the dispute is section 267(a)(2)(A) which requires the deductions to be disallowed if within the corporation's taxable year and two and one-half months after the close thereof, the amount of such items is not paid and the amount of such items is not otherwise includable in the gross income of the payee. *78 The requirement of section 267(a)(2)(A) is satisfied and thus the deduction allowable, if the recipient must include the item in his taxable income within two and one-half months of the end of the taxpayer's fiscal year under the doctrine of constructive receipt. Liflans Corporation v. United States,182 Ct. Cl. 825, 390 F.2d 965, 974 (1968); F.D. Bissett & Son, Inc. v. Commissioner,56 T.C. 453, 461 (1971); Young Door Co., Eastern Division v. Commissioner,supra at 893-894; Geiger & Peters, Inc. v. Commissioner,27 T.C. 911, 919-920 (1957). Petitioner G & W, Inc., appears to argue that since the amounts credited as compensation on the corporation's books in November 1973 offset amounts Lewis, James, and Eddie received during the corporation's fiscal year, they have received, actually or constructively, the income within two and one-half months after the close of G& M, Inc.'s taxable year. We do not agree. First the record is devoid of information as to the nature and purpose of the advances or draws received *79 by the shareholder-officers during the corporation's fiscal year. The record does not show whether they received those amounts conditionally or unconditionally or whether they had any obligation to repay those amounts to the corporation.Those advances or draws would not be includable in the individual taxpayers' income until their rights to such amounts became unconditionally fixed. Sec. 1.451-2, Income Tax Regs. The record does not establish that this occurred at any time before the compensation amounts were credited to their accounts in November of 1973. See Mattlage v. Commissioner,3 B.T.A. 242 (1925). [29] This was not within two and one-half months of the close of G & W, Inc.'s taxable year.We perceive no basis for finding that the crediting of such amounts of compensation in November of 1973 somehow related back to the times in 1972 and early 1973 when the various draws were made. Nor did the individual taxpayers constructively receive such amounts of compensation within the requisite two and one-half month period after *80 February 28, 1973. The regulation, section 1.451-2(a), Income Tax Regs., defines constructive receipt as follows: Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. * * * We have repeatedly approved this definition of constructive receipt. [30] To meet the two and one-half month requirement, we must find that such compensation was constructively received by the employees no later than May 15, 1973. The posting of such credits to their accounts in November of 1973 cannot satisfy this. Ford, the accountant for G & W, Inc., testified about his audit of the corporation in the process of preparing its income tax *81 return for the fiscal year ended February 28, 1973. He testified that before May 15, 1973, he had determined that the officers (e.g. Lewis, James, and Eddie) were entitled to certain compensation but that for some reason these amounts were not posted on the corporation's books until much later. Ford's testimony about this entire matter was vague and unpersuasive. Moreover, nothing in the record indicates that Ford as accountant had any authority or power to determine or authorize the payment of compensation to the corporate officers. Compare F.D. Bissett & Son, Inc. v. Commissioner,supra,56 T.C. at 459, 462. Here, no corporate resolution authorizing the salaries was introduced into evidence, nor did Lewis, the only other witness, testify about any such authorization by the corporation.
*82 Whether a taxpayer has constructively received income is largely a question of fact. Avery v. Commissioner,292 U.S. 210 (1934); Kaw Dehydrating Co. v. Commissioner,74 T.C. 370, 376 (1980); Lacy Contracting Co. v. Commissioner,supra;F.D. Bissett & Son, Inc. v. Commissioner,supra at 461; R. E. Hughes, Jr. v. Commissioner,42 T.C. 1005, 1012 (1964). The record is wholly inadequate to establish that any of the officers constructively received within two and one-half months of the close of the corporation's fiscal year as income the amounts claimed as deductions by G & W, Inc. G. & W, Inc., has failed to carry its burden of proof, and accordingly, we find for respondent on this issue. Issue No. 6: Section 1231 Involuntary Conversion
FINDINGS OF FACT AND OPINION In 1973, Riverbend began the construction of a 215-unit apartment complex on Cabinet Drive, near Nashville, Tennessee. Before the construction, Cabinet Drive was a dead-end road terminating at a farm near the land that Riverbend had obtained for its apartment complex. *83 The land Riverbend had obtained was not originally zoned for apartments, so Riverbend obtained a rezoning. Apparently the County required another access from the apartment complex as a condition of the approval of the rezoning. However, there is no evidence in the record in regard to the zoning proceeding or in regard to the particular conditions, if any, imposed upon Riverbend in regard to the use of its land. Riverbend constructed another access to the apartment complex by extending Cabinet Drive approximately 800 feet. Riverbend spent some $87,500 in constructing the road extension. The land upon which Riverbend built this road extension was not part of its original land acquisition for the apartment complex, nor did Riverbend acquire this land as an additional land purchase. Instead, the property owners apparently gave Riverbend a right-of-way to build the road over their lands. The record is silent as to when Riverbend acquired this right-of-way or as to the nature of the property rights, if any, that Riverbend acquired in regard to the right-of-way. After the completion of the road, Riverbend, the property owners, or possibly both, dedicated it to the County. There *84 is no evidence in the record as to when, how, or by whom this dedication of the road to the County took place. On its 1973 partnership return, Riverbend reported the $87,500 expenditure in building this road as an ordinary loss under the involuntary conversion provision of section 1231. Lewis and James reported their distributive shares of the claimed section 1231 loss on separate Forms 4797 (Supplemental Schedule of Gains and Losses) attached to their 1973 returns. Respondent disallowed the claimed section 1231 loss on the ground that it constituted a nondeductible capital expenditure rather than an involuntary conversion under section 1231.
Section 1231[31] provides a special rule that allows capital gains treatment for certain transactions that would otherwise be ordinary income, and allows ordinary loss treatment for certain transactions that would otherwise constitute capital losses.On its 1973 partnership return, Riverbend claimed as a section 1231 ordinary loss from an involuntary conversion the cost of constructing the access road which it had built and dedicated to the County, *85 and each individual partner reported his share of the claimed section 1231 loss on his individual return. Petitioners argue that Riverbend incurred a section 1231 loss because had not Riverbend constructed the road and dedicated it to the County, "the governmental authority would have prevented the construction of the apartment complex and thereby the partnership would have been deprived of the use of its land for the purposes intended." Respondent disallowed the claimed section 1231 loss and argues that the petitioners have failed their burden of proof to show that they are entitled to such a loss. We agree with respondent. *86 Section 1231(a) permits an ordinary loss for the involuntary conversion of property used in the taxpayer's trade or business or a capital asset, if held for more than six months. Petitioners have not shown that the "property" they claim was involuntarily converted was either property used in the trade or business or a capital asset. From Lewis' testimony it appears that Riverbend did not own the property upon which the road dedicated to the County was constructed. Instead, the property owners apparently gave Riverbend or the County a right-of-way and the partnership built a road extension on that right-of-way. On the record in this case, we cannot determine that Riverbend had a property right within the meaning of section 1231. Compare Commissioner v. Gillette Motor Transport, Inc.,364 U.S. 130 (1960) with Kingsbury v. Commissioner,65 T.C. 1068, 1083 (1976). Assuming that the construction and dedication of the access road to the County were required as a condition of obtaining the rezoning of Riverbend's land for the apartment complex, petitioners *87 have not persuaded us that such governmental action constituted an involuntary conversion. Section 1.1231-1(e)(1), Income Tax Regs. provides: For purposes of section 1231, the terms "compulsory or involuntary conversion" and "involuntary conversion" of property mean the conversion of property into money or other property as a result of complete or partial destruction, theft or seizure, or an exercise of the power of requisition or condemnation, or the threat or imminence thereof. Losses upon the complete or partial destruction, theft, seizure, requisition, or condemnation of property are treated as losses upon an involuntary conversion whether or not there is a conversion of the property into other property or money. Rarely, if ever, will a governmental authority's land use regulations constitute a condemnation under its eminent domain powers. See Agins v. City of Tiburon,447 U.S. 255 (1980); Penn Central Transp. Co. v. New York City,438 U.S. 101 (1978); Euclid v. Ambler Co.,272 U.S. 365 (1926); *88 Hadacheck v. Los Angeles,239 U.S. 394 (1915). Cf. Kaiser Aetna v. United States,444 U.S. 164 (1979). Since the denial of a contemplated beneficial use of land does not constitute an eminent domain taking, it is difficult to see how money spent to obtain governmental permission for the contemplated use constitutes a loss from the threat or imminence of the government's exercise of its power of requisition or condemnation. Riverbend's expenses of building this access road were simply another cost of the apartment complex and not a loss through involuntary conversion. Issue No. 7: Payments by Belmont Lodge
FINDINGS OF FACT AND OPINION Lewis, Eddie, and James were partners in Belmont Lodge during 1973 and were also shareholders in G & W, Inc. In his notice of deficiency, respondent determined that the sum of $20,000 was received by Lewis, Eddie, and James for services rendered to Belmont Lodge. [32] Petitioners argue that this $20,000 was payable to and in fact was paid to their corporation, G & W, Inc., [33] for constructing the Belmont Lodge apartment complex, rather than to Lewis, Eddie, and James in their capacity as partners in Belmont *89 Lodge. *90 Lewis testified in vague general terms that the only money he received from Belmont Lodge was through the construction company, G & W, Inc., and that he received no money for services rendered as a partner. Ford, the accountant, prepared Lewis' 1973 income tax return. He did not include as income the sum of $6,666.67 paid by Belmont Lodge, one-third of the total $20,000 payment by Belmont Lodge. In preparing the return, Ford obtained the information either from the taxpayers or from the books and records of the entities involved. Ford testified that the $20,000 was due and owing to G & W, Inc., by reason of the construction contract. We accord little weight to this testimony. Ford testified that he obtained the information from the records of the business entities, but these business records were not produced.No foundation was laid to show that Ford had personal knowledge of the $20,000 payment or of the services for which it was paid. Neither Eddie nor James testified. None of the records of Belmont Lodge were introduced into evidence. Lewis' vague, self-serving testimony is insufficient to carry petitioners' burden of proof.Accordingly, on this issue we find for respondent. *91 Issue No. 8: Unidentified Bank Deposits
FINDINGS OF FACT AND OPINION In his notice of deficiency, respondent determined that Lewis had $38,924 in taxable income as a result of certain unidentified deposits to his checking and savings accounts. Unexplained bank deposits are properly includable in income, and Lewis bears the burden of proof to show that these bank deposits are not taxable income to him. Brittingham v. Commissioner,57 T.C. 91, 100 (1971); O'Dwyer v. Commissioner,266 F. 2d 575 (4th Cir. 1959), affg. 28 T.C. 698 (1957), cert. denied 361 U.S. 862 (1959); Hoefle v. Commissioner,114 F. 2d 713 (6th Cir. 1940), affg. a Memorandum Opinion of the Board of Tax Appeals. To meet this burden, Lewis must identify and explain the deposits sufficiently to show that the deposits represent either items already reported as income or items which do not constitute taxable income. At trial, Lewis testified about some of these "unidentified" deposits, and that was the only evidence offered on these *92 deposits. [34] We find that Lewis has sufficiently identified and explained some of these items, but has not sufficiently identified and explained the rest. *93 Lewis testified that two of these deposits related to his sale of Bluegrass Estates, a deposit of $1,000 as earnest money and a second deposit from a later payment of $15,000. Lewis reported his gain from the sale of a lot in Bluegrass Estates on the Schedule D (Capital Gains and Losses) attached to his 1973 return. Although this $16,000 does not account for the total gross sales price of $21,000, we find his reporting of this sale on his 1973 return sufficiently corroborates his testimony and that this $16,000 should not be included again in his 1973 income. Lewis testified that a deposit in the amount of $996.11 represented insurance reimbursement for hospital expenses and doctors for the birth of his youngest daughter. While there should have been documents to establish that fact and while Lewis should have testified in more detail about the matter, counsel did not pursue the matter and we find his testimony sufficient to establish that the $996.11 was insurance reimbursement. As to certain other items Lewis testified about, we find that Lewis did not sufficiently identify and explain those deposits and therefore hold for respondent. Lewis testified that a deposit in *94 the amount of $1,599.44 was a commission earned from a project called Lake Haven. While Lewis testified that he believed that this amount had been reported on his return, we are not persuaded that it was.Thus we sustain respondent's determination that this amount should be added to Lewis' income for 1973. Lewis then testified "The next $800, I don't know. I have no idea." The remainder of his testimony on this item appears to be speculation that it may have been some money he received from the sale of a Toronado automobile to a former employee named Leroy Witson. We find this testimony wholly insufficient to establish that the $800 was either an item not includable in taxable income or an item that had already been included on his return. Lewis next testified that a deposit in the amount of $2,049.17 represented an insurance check for damage to his house and boat dock from a tornado. Again, there was no further detail and no documentary corroboration. Again, we find his testimony insufficient to carry his burden of proof. Lewis testified that a deposit in the amount of $8,000 represented a transfer of funds from a savings account. Here, Lewis did not even identify the bank *95 or banks involved. This is a matter that should have been readily susceptible of documentary proof by petitioner from third-party sources (the banks) or his own records. Invocation of the doctrine of Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158 (1946), affd. 162 F. 2d 513 (10th Cir. 1947), may well be justifiable. In any event, Lewis' self-serving assertion that the $8,000 was transferred from a savings account is insufficient to carry his burden of proof. The last item was a deposit in the amount of $6,479.28. Lewis testified that this was the proceeds from the sale of a boat to a Jim Ashton. He further testified that the gross sales price was $6,500 and the odd amount represented an amount which the purchaser set off against the price for the cost of repairing some minor defect. Lewis testified in greater detail on this deposit, and particularly upon the reason for the odd amount.However, petitioner did not testify about the age of the boat, the original purchase price, or his cost basis. We cannot determine whether petitioner had a gain or a loss from this transaction. On this record, however, we have no choice except to sustain *96 respondent's determination. Accordingly, we find that Lewis did not sufficiently identify and explain this deposit either as having been reported on his 1973 return, or as being not reportable in gross income. We hold for respondent on this issue. These deposits which Lewis purported to identify only add up to a total of $35,924, $3,000 less than the amount determined by respondent. Neither petitioner nor respondent favored us with a list of the eight deposits which respondent included in Lewis' gross income. Lewis as petitioner has the burden of proof on this issue and he has failed to carry it. Rule 142. Thus, as to the remaining $3,000 that Lewis did not attempt to identify, we sustain respondent's determination. In conclusion, we hold that Lewis has satisfactorily identified and explained a total of $16,996.11 of these deposits. However, respondent properly included the balance of $21,927.89 ($38,924 - $16,996.11) in Lewis' income for 1973. Issue No. 9: Section 6653(a) Addition to Tax
OPINION In his notice of deficiency, respondent determined that Lewis was liable for an addition to tax under section 6653(a)[35] on the ground that part of his 1973 underpayment *97 was due to negligence or intentional disregard of rules and regulations of the tax law. Lewis as petitioner bears the burden of proof on this issue. Bixby v. Commissioner,58 T.C. 757, 791-792 (1972); Rosano v. Commissioner,46 T.C. 681, 688 (1966). Respondent's determination of the negligence additions is based upon the eight unidentified bank deposits that he determined were includable in Lewis' income. We have held that Lewis has failed to carry his burden of proof to identify and explain almost $22,000 of those bank deposits. He failed to maintain or present adequate records on these items. *98 A taxpayer's failure to keep adequate books and records, which he is obliged to do, (sec. 6001; sec. 1.6001-1(a)(4), Income Tax Regs.), is justification for the negligence addition. Axelrod v. Commissioner,56 T.C. 248, 258-259 (1971). Accordingly, we sustain respondent's determination on the negligence addition. To reflect the above, Decisions will be entered under Rule 155.
Footnotes
1. The cases of the following petitioners have been consolidated: Billy J. Gaines and Martha C. Gaines, docket No. 8305-78; Lewis E. Gaines, Jr. and Jackie Gaines, docket No. 8306-78; Gaines and Wright Construction Co., Inc., docket No. 8307-78; James P. Mather and Martha T. Mather, docket No. 8308-78; and Lewis E. Gaines and Donna E. Gaines, docket No. 8309-78.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question, and all references to "Rules" are to the Tax Court Rules of Practice and Procedure.↩
3. Those issues, as to which petitioners have either conceded or failed to carry their burden of proof, are as follows: 1. Whether respondent properly increased their distributive share of partnership income of Realty Advisors (docket Nos. 8305-78, 8309-78). 2. Whether respondent properly increased petitioners' gain from the sale of an interest in the Executive Plaza partnership (docket No. 8305-78); 3. Whether petitioner Martha C. Gaines was liable for self-employment taxes for 1973, or whether she was an employee of her partnership, Realty Advisors (docket No. 8305-78); 4. Whether partnership income and capital gains from the sale of their partnership interests in Belmont Lodge were properly taxable to petitioners or to a trust (docket Nos. 8306-78, 8308-78, 8309-78); 5. Whether petitioners received a constructive dividend when a corporation in which petitioner-husband was a shareholder paid a pre-existing obligation of a predecessor partnership upon which petitioner-husband was personally liable (docket No. 8306-78); 6. Whether respondent had correctly computed their gain on the sale of their interests in the Belmont Lodge partnership (docket Nos. 8308-78, 8309-78); and 7. Whether respondent acted arbitrarily in recomputing certain items of income and deductions to reflect accurately petitioner-corporation's use of the completed contract method of accounting (docket No. 8307-78).↩
4. In his notice of deficiency, respondent treated Gaines Properties rather than Lewis as the partner in Walker Springs. We have accepted the parties' stipulation that it was Lewis who was the partner in Walker Springs. Gaines Properties was not a partner in Walker Springs, and this will result in an adjustment in James Mather's distributive share of partnership gain (or loss).↩
5. Mr. Ford is the taxpayers' attorney of record in these cases and has not withdrawn from the cases although he testified as the principal witness on behalf of the taxpayers. The Court finds this dual role of advocate and witness troubling even though the trial was conducted by someone other than Mr. Ford. See Canons of Professional Ethics, Canon 19 and Code of Professional Responsibility, Canon 5 (EC 5-9, DR 5-101(B), DR 5-102).↩
*. The balance of legal fees was disallowed for lack of substantiation.↩
*. Respondent allowed this amount as an amortization deduction, with the expenditure to be amortized over the life of the loan.↩
6. Several items make up this sum. Respondent determined that two items, permanent loan fees of $20,085 and a $1,426.40 fee for a letter of credit, while not deductible, should be amortized over the life of the loan. However, respondent allowed Northfield Manor no amortization deduction for 1973, and the Court has no information as to the life of the loan.↩
7. While many of the documents in evidence suggest that only Gaines Properties was a partner in Brookwood, we have accepted the parties' stipulation that both Lewis and Gaines Properties were partners in Brookwood. This may result in an adjustment to James Mather's distributive share of gain (or loss) from Gaines Properties.↩
*. Respondent determined that this $42,000 should be amortized over the life of the loan. Respondent did not allow any amortization deduction for 1973, however, because the loan did not begin until after December 31, 1973.↩
*. Respondent determined that this fee should be amortized over the life of the loan but allowed Walker Springs no amortization deduction in 1973, however, because the loan did not begin until after December 31, 1973.↩
*. Respondent determined that the permanent loan costs should be amortized over the life of the loan, and consequently allowed Gaines Realty an amortization deduction of $1,194.44 for 1973.↩
*. Amortization deduction for 1973, with claimed fee to be amortized over the life of the loan. ↩
8. In his petition, Lewis did not contest the disallowance of $2,711 interest expense claimed by Dawson Village on its return and disallowed by respondent in the notice of deficiency. Nonetheless, Lewis introduced into evidence several documents purporting to prove that more interest was paid. The first of these documents, a mortgagor's certificate of actual cost, shows interest during construction of $26,124.75 that was paid in cash. The document however is undated and nothing in the record indicated that any or all of that interest was properly accrued and deducted during 1973. The second document consists of three forms, entitled Request for Payment, which include a request for payment of certain interest amounts. These documents however are all dated during 1972, and all relate to interest accrued during 1972. The last document, a letter from Lincoln Mortgage Corporation to Gaines & Gaines Construction, dated November 15, 1973, refers to a payment due in connection with Dawson Village on December 1, 1973, that includes interest of $3,174.56. These unexplained documents do not establish that Dawson Village is entitled to a deduction for interest expenses in an amount greater than respondent allowed.↩
*. Amortization deduction for 1973, the entire fee to be amortized over the life of the loan. ** To be added to basis of building and depreciated over life of building. ↩
9. Respondent disallowed most of Westview's claimed deductions for construction loan interest and points. It is not clear whether Lewis' petition contests that determination. In any event, Lewis presented no evidence to show that he is entitled to a deduction for interest and points in an amount greater than respondent allowed. Rule 149(b).↩
10. Respondent disallowed a total of $37,890.79 because of adjustments to partnerships in which Gaines Properties was a partner, including Lincoln Manor, Brookwood, Riverbend, Gaines Realty, Walker Springs, and Northfield Manor, as detailed in the above findings in regard to those partnerships. However, we have found, as stipulated by the parties, that Gaines Properties was not a partner in Walker Springs and that only Lewis was a partner in Walker Springs. See footnote 4 above.↩
11. To the extent a taxpayer can show that a loan fee was an additional cost of the borrowed money, rather than a charge for compensation for the services rendered in obtaining the loan, the expense may be treated as deductible interest under section 163. Noble v. Commissioner,79 T.C. 751 (1982); Enoch v. Commissioner,57 T.C. 781, 794-795 (1972). Here petitioners have claimed deductions only as ordinary and necessary business expenses under section 162(a), not deductions as interest under section 163.Consequently, we need not consider whether section 163↩ would apply. We note, however, that the record is inadequate to establish that any of the loan costs or finance fees were actually a part of the cost of borrowed money rather than compensation for services in obtaining the loan.
12. SEC. 709.TREATMENT OF ORGANIZATION AND SYNDICATION FEES. (a) General Rule.--Except as provided in subsection (b), no deduction shall be allowed under this chapter to the partnership or to any partner for any amounts paid or incurred to organize a partnership or to promote the sale of (or to sell) an interest in such partnership. (b) Amortization of Organization Fees.-- (1) Deduction.--Amounts paid or incurred to organize a partnership may, at the election of the partnership (made in accordance with regulations prescribed by the Secretary), be treated as deferred expenses. Such deferred expenses shall be allowed as a deduction ratably over such period of not less than 60 months as may be selected by the partnership (beginning with the month in which the partnership begins business), or if the partnership is liquidated before the end of such 60-month period, such deferred expenses (to the extent not deducted under this section) may be deducted to the extent provided in section 165. (2) Organizational Expenses Defined.--The organizational expenses to which paragraph (1) applies, are expenditures which-- (A) are incident to the creation of the partnership; (B) are chargeable to capital account; and (C) are of a character which, if expended incident to the creation of a partnership having an ascertainable life, would be amortized over such life.↩
13. The Conference Report following the Senate amendment but delaying the effective date for the amortization of organization fees expressly stated that "The conferees intend that no inferences should be drawn as to the deductibility (when paid) of partnership organization and syndication fees paid or incurred in taxable years beginning before January 1, 1976." S. Rept. No. 94-1236 (1976), 1976-3 C.B. (Vol. 3) 825. Thus, the fact that section 709↩ is effective prospectively only does not mean, as petitioners argue, that it represents a change in the law (other than the admitted change in regard to the 60-month amortization provision).
15. It appears that respondent disallowed deductions of at least $40,000 of Gaines Properties' share of Brookwood's guaranteed payments, at least $24,000 of its share of Riverbend's guaranteed payments, and at least $22,641.56 of its share of Gaines Realty's quaranteed payments, a total disallowance of at least $86,641.56. In view of our holding on the guaranteed payments issue, we need not determine the exact amounts of Gaines Properties' share of guaranteed payments that respondent disallowed as deductions to the limited partnerships.↩
16. Transactions between a partner and his partnership when the partner is not acting in his capacity as a partner are governed by section 707(a), not section 707(c). W. McKee, W. Nelson, and R. Whitmire, Federal Taxation of Partnerships and Partners, par. 13.01[2]. See also Pratt v. Commissioner,64 T.C. 203, 210-211 (1975), affd. on this issue 550 F. 2d 1023↩ (5th Cir. 1977).
17. As part of a partner's distributive share of profit and loss, the guaranteed payments included in his income increase the partner's basis in his partnership interest. Sec. 705(a)(1) and (2).↩
18. Respondent apparently treated this paragraph 12.2 of Walker Springs' amended partnership agreement as having the same effect as paragraph 12.2 of the Brookwood amended agreement, namely, that the interest imputed on the installment contributions of the limited partners would be payable to the general partners. None of the petitioners seem to have contested this determination. We accept this reading of paragraph 12.2 of the Walker Springs agreement, although we note that the phrase "all Cash Receipts" could have broader application than the "imputed interest" language in the Brookwood agreement.↩
19. On brief respondent explained that this $54,797 figure was comprised of the $29,449 reported on Brookwood's balance sheet as the liability for accrued interest income and the sum of $25,348, which is one-half of the $50,696 reported in Walker Springs' balance sheet as an expense for "interest collected in advance, unearned."↩
20. On brief, respondent seems to have abandoned the constructive receipt argument and to argue that the imputed interest deducted from the limited partner's capital contributions were in fact relinquishments of capital interest by those partners which result in income to general partners under section 1.721-1(b)(1), Income Tax Regs. Since this issue was raised for the first time on brief and constitutes a new matter, we will not address the issue here. Achiro v. Commissioner,77 T.C. 881, 890-891 (1981); Aero Rental v. Commissioner,64 T.C. 331, 338↩ (1975).
21. Ford, the accountant and attorney for G & W, Inc., and for the individual Gaines family members, testified that the disallowed expenses "were liabilities assumed by that corporation when they took over the business of the partnership." However, neither Ford's testimony nor the remainder of the record lays a sufficient foundation to satisfy the Court that Ford had personal knowledge of the details of the incorporation of G & W, Inc. In the absence of any documentary evidence, we are unwilling to accept his vague, generalized testimony as establishing that in fact these liabilities were assumed by the corporation.↩
22. Accord, M. Buten & Sons, Inc. v. Commissioner,T.C. Memo. 1972-44↩. See also Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 3.12 at n. 120 (1979).
23. Petitioners made these arguments in their petition but failed to address them in their post-trial brief. We have also considered the other cases cited in the petition and find them distinguishable. Bongiovanni v. Commissioner,470 F. 2d 921 (2d Cir. 1972), involved the problem of the application of section 357(c) during the midstream of incorporation of a cash basis taxpayer's business, specifically the problem of accounts payable. The court stated that the successor corporate taxpayer would be entitled to a deduction upon paying the accounts, but this was not the issue before the court. Rooney v. United States,305 F. 2d 681 (9th Cir. 1962), involved the Commissioner's application of section 482 to the midcrop incorporation of a farming business in order to reallocate pre-incorporation expenses of the enterprise. In Rooney, an individual farmer had made a contract for the sale of the crop and had incurred many expenses, but incorporated before the income was collected. The Commissioner applied section 482 to deny the individual taxpayer deductions for the expenses. Finally, Citizens National Trust and Savings Bank v. Welch,119 F. 2d 717↩ (9th Cir. 1941), involved the merger of state and national banking associations. At the time of the merger, the state bank owed certain debts, which the national bank assumed and paid. The state bank claimed the deductions on its return. Respondent disallowed the deduction to the state bank because it had not paid the debt. Since the national bank had been allowed the deduction, it could not be heard to say that the state bank should also be allowed the same deduction. 24. In fact, the Fifth Circuit reversed and remanded for the District Court to have a hearing and make express findings on the issue, on the ground that the issue had not previously been fully and fairly presented. 418 F. 2d at 592-593↩.
25. The amounts posted ($6,060.70, $5,932, and $5,932, respectively for Eddie, Lewis, and James) were net amounts after withholding deductions for income and social security taxes. The ledger shows these amounts as posted on November 9, 1973, rather than November 19, 1973, the date stipulated by the parties. Since either date is more than two and one-half months after the close of G & W, Inc.'s fiscal year on February 28, 1973, we need not resolve the conflict between the stipulation and the exhibit.↩
26. G & W, Inc.'s Federal tax return (Form 1120) for its fiscal year ended February 28, 1973, is dated July 30, 1973, and was received by the Internal Revenue Service on August 13, 1973.↩
27. As in effect in 1973, section 267(a)(2) provided: (a) Deductions Disallowed.--No deduction shall be allowed-- (2) Unpaid Expenses And Interest.--In respect of expenses, otherwise deductible under section 162 or 212, or of interest, otherwise deductible under section 163,-- (A) If within the period consisting of the taxable year of the taxpayer and 2 1/2 months after the close thereof (i) such expenses or interest are not paid, and (ii) the amount thereof is not includible in the gross income of the person to whom the payment is to be made; and (B) If, by reason of the method of accounting of the person to whom the payment is to be made, the amount thereof is not, unless paid, includible in the gross income of such person for the taxable year in which or with which the taxable year of the taxpayer ends; and (C) If, at the close of the taxable year of the taxpayer or at any time within 2 1/2 months thereafter, both the taxpayer and the person to whom the payment is to be made are persons specified within any one of the paragraphs of subsection (b).↩
28. In fact it is not clear whether petitioner still challenges this adjustment at all. The issue was briefly alluded to in petitioner's trial memorandum but was not addressed at all in the post-trial brief. The fact that the recipient used the cash method of reporting income is sufficient to meet the requirement of subparagraph (B). See (A)-1 (A)-1 sec. 1.267 (a)-1(b)(1)(ii), Income Tax Regs.Hyplains Dressed Beef, Inc. v. Commissioner,56 T.C. 119, 125 (1971). Lewis and Eddie are father and son, so as to them the requirement of subparagraph (C) is clearly met. See sec. 267(b)(3), (c)(4). As to James, the record does not establish how he is a related taxpayer under section 267↩. Since the parties do not address this we will consider it as conceded and discuss it no further.
29. See also Winkelman v. Commissioner,↩ a Memorandum Opinion of this Court, filed February 20, 1943.
30. Kaw Dehydrating Co. v. Commissioner,74 T.C. 370, 375 (1980); Benes v. Commissioner,42 T.C. 358, 381 (1964), affd. 355 F. 2d 929 (6th Cir. 1966), cert. denied 384 U.S. 961 (1966); Young Door Co., Eastern Division v. Commissioner,40 T.C. 890, 894↩ (1963).
31. As in effect in 1973, section 1231(a) provided: (a) General Rule.--If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets.For purposes of this subsection-- (1) in determining under this subsection whether gains exceed losses, the gains described therein shall be included only if and to the extent taken into account in computing gross income and the losses described therein shall be included only if and to the extent taken into account in computing taxable income, except that section 1211 shall not apply; and (2) losses (including losses not compensated for by insurance or otherwise) upon the destruction, in whole or in part, theft or seizure, or requisition or condemnation of (A) property used in the trade or business or (B) capital assets held for more than 6 months shall be considered losses from a compulsory or involuntary conversion. In the case of any involuntary conversion (subject to the provisions of this subsection but for this sentence) arising from fire, storm, shipwreck, or other casualty, or from theft, of any property used in the trade or business or of any capital asset held for more than 6 months, this subsection shall not apply to such conversion (whether resulting in gain or loss) if during the taxable year the recognized losses from such conversions exceed the recognized gains from such conversions.↩
32. Generally, a distribution of cash or property to a partner by a partnership does not require the partner to recognize income or gain. Sec. 731(a); sec. 1.731-1(a)(1), Income Tax Regs. Instead, his basis in his partnership interest is reduced by the amount of the distribution. Secs. 705(a)(2), 733; secs. 1.705-1(a)(3), 1.733-1, Income Tax Regs. However, a partner who receives payments for services to the partnership must report that income, either under his normal accounting method for services rendered to the partnership other than in his capacity as a partner, sec. 707(a); sec. 1.707-1(a), Income Tax Regs., or in his taxable year during which or with which the partnership's taxable year ends, for services rendered to the partnership in his capacity as a partner. Secs. 706(a), 707(c); secs. 1.706-1(a), 1.707-1(c), Income Tax Regs.↩
33. There is some confusion as to which corporation petitioners are referring to in their argument. At trial, Lewis testified about G & W, Inc. On brief, petitioners talk about a corporation called "Impala Homes, Inc." There is no evidence in the record concerning an "Impala Homes, Inc." In light of our decision on this issue, we need not address this discrepancy.↩
34. At trial, respondent first objected to Lewis testifying and then moved to strike his testimony regarding the bank deposits. The Court overruled his objections and denied the motion. Respondent first seemed to argue that the testimony pertained to matters on which respondent had sought but failed to obtain discovery. Respondent served interrogatories upon Lewis asking him to identify these deposits. Lewis answered these interrogatories, apparently in a very cursory manner. However, respondent never asked the Court to review the sufficiency of the responses or to impose any sanctions in regard to discovery proceedings. In fact, respondent did not introduce into evidence the affidavit and the answers to the interrogatories and we cannot judge whether petitioner's testimony went beyond them. Respondent's second argument seemed to proceed on the basis that he "has never been provided with any documentary evidence at all which would be the best evidence of what these deposits were," and "that there is documentary evidence which could be introduced which was not produced." The best evidence rule excludes secondary evidence of a writing only when the terms of the writing are at issue. Here the issue is the identity (source) of the various bank deposits. While documents could perhaps establish the fact of the deposits and the source, the terms of the particular documents are not at issue in this case. See Rule 1002, Federal Rules of Evidence, and the official comments thereto. Finally, on brief, respondent cites petitioner's failure to introduce the documentary evidence as justifying the invocation of the doctrine of Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158 (1946), affd. 162 F. 2d 513↩ (10th Cir. 1947). The doctrine states that where a petitioner having the burden of proof fails to produce evidence in his possession bearing upon the issue before the Court, the Court may presume that had the evidence been presented, it would not have supported the petitioner.Here, the record in most instances does not establish the existence of any documents in Lewis' possession that might justify invocation of the doctrine. At most, there apparently were "some little old scratch pieces of paper" that Lewis and his wife may have prepared perhaps in 1973 but not necessarily contemporaneously with the deposit transactions. This is simply insufficient to permit invocation of the doctrine. Of course, Lewis' inability to corroborate his testimony through documentary evidence from third-party sources, particularly in those instances where there normally should be such documentary evidence, bears upon the weight which we accord to his vague, self-serving testimony.
35. Section 6653(a), as in effect in 1973, provided: If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.↩